UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| WOLF LAKE DEVELOPMENT LLC | ) | Case No. 26-10031 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**OBJECTION BY MII HURON HOLDINGS, SA TO SCHEDULED GENERAL UNSECURED CLAIMS OF JAMES FERNANDO LOPEZ AND O'NEAL MCCALL**

NOW COMES MII Huron Holdings, SA ("MII Huron") and objects to the scheduled general unsecured claims of O'Neal McCall and James Fernando Lopez (a/k/a Jamie Lopez), and in support thereof, shows the Court as follows:

1. Wolf Lake Development, LLC filed for relief under Chapter 11 of the Bankruptcy Code on February 4, 2026.

2. MII Huron is a general unsecured creditor of the Debtor. On May 6, 2026, MII Huron filed amended Proof of Claim No. 2, evidencing its general unsecured claim in the amount of $1,616,021.88.

3. As a general unsecured creditor, MII Huron is a party in interest in this bankruptcy case, and therefore has standing to object to claims of creditors. See 11 U.S.C. §§ 502(a) and 1109(b). *See also In re Tara Retail Group, LLC*, 595 B.R. 215, 222 (Bankr. N.D. WVa. 2018) (general unsecured creditor has prudential and constitutional standing to object to claims and request recharacterization of debt to equity).

4. The Debtor's bankruptcy schedules list James Fernando Lopez (a/k/a Jaime Lopez) ("Lopez") as holding a general unsecured claim in the amount of $164,680.65. The Debtor's bankruptcy schedules also list O'Neal McCall ("McCall") as holding a general unsecured claim in the amount of $142,793.33. Neither of these parties filed proofs of claim evidencing their supposed general unsecured claims.

5. For the reasons outlined below, the scheduled general unsecured claims of McCall and Lopez should be recharacterized as equity.

6. The Fourth Circuit recognizes that bankruptcy courts possess authority to recharacterize purported debt as equity when the substance of the transaction reflects a capital contribution rather than a bona fide loan. *Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225 (4th Cir. 2006). This

power is "essential to the implementation of the Code's mandate that creditors have a higher priority in bankruptcy than those with an equity interest." *Fairchild Dornier*, 453 F.3d at 233.

7. Wolf Lake is a member-managed North Carolina limited liability company formed in 2020 for the specific purpose of developing residential real estate in Jackson County, North Carolina. The three equal members are McCall, Lopez, and Manuel Rodriguez ("Rodriguez"). McCall and Lopez now assert claims totaling approximately more than $300,000 based on purported loans they made to Wolf Lake during the company's operations.

8. These purported loans lack the essential characteristics of arm's-length debt. They were made by insiders with complete identity of interest with the debtor, were unsecured, bore no fixed maturity dates, bore no perceivable interest rates, required no periodic payments, and were advanced to keep a project going that could not obtain normal financing or draw interest from other investors. The transactions bear all the hallmarks of equity contributions made by owners to keep their venture afloat, not loans made by disinterested creditors expecting repayment on fixed terms.

9. MII Huron respectfully requests that this Court apply the eleven-factor test established in Fourth Circuit precedent and recharacterize the McCall and Lopez advances as equity, thereby subordinating their claims to those of true creditors, including MII Huron.

## I. FACTUAL BACKGROUND

### A. Formation and Ownership Structure

10. The Debtor, Wolf Lake Development, LLC, was formed in 2020 specifically for the purpose of developing real estate in Jackson County, North Carolina (the "Project"). As outlined in the Debtor's Statement of Financial Affairs, the Debtor has three equal member / owners: McCall, Lopez, and Manuel Rodriguez. Lopez serves as managing partner. Lopez Tr. 11:17-18, attached hereto as **Exhibit A**

### B. The Wolf Lake Development Project and MII Huron Loan

11. As represented to MII Huron, the Project was to consist of several individual residential lots, including Lots 1 and 3B, together with a larger tract of undeveloped property referred to as the Mountain Meadows tract. Lopez Tr. (Exhibit A) at 12:1-23; 41:11-14.

12. As set forth in MII Huron's Proof of Claim No. 2, MII Huron loaned Debtor $1,000,000 ("Huron Loan"). The loan was made in three installments: $180,000.00 on January 11, 2021; $320,000.00 on February 25, 2021; and $500,000.00 on August 9, 2021. The Huron Loan was made in connection with, and for the purpose of funding, the Project. The first and second installments of the Huron Loan were for Lots 1 and 3B. At the time, McCall's company, O'Neal Land Company, owned those lots. The third installment was for the Mountain Meadows tract. Guarantee Agreements executed in connection with these loans identified Lots 1 and 3B as collateral for the first $500,000 loan (installments one and two) and the Mountain Meadows tract as collateral for the second $500,000 loan. Lopez Tr. (Exhibit A) 16:25-17:17; 30:25-31:23. *See also* **Exhibits B, C, and D.**

13. McCall, however, used $40,000 of the initial installment to pay off an existing loan against the property. McCall obtained that prior loan, the Valley Song loan, to pay off a fraudulent conveyance judgment that was rendered against him. That judgment involved these very properties. McCall Tr. at 54:13-56:12, attached hereto as **Exhibit E**; *see also* **Exhibit F**. McCall does not know if MII Huron was ever told about this. McCall Tr. at 54:24-55:5. Between January 11, 2021 and August 20, 2021, McCall also withdrew more than $50,000 from the Debtor's account as purported management fees. Lopez withdrew more than $28,000. Rodriguez withdrew $70,000. **Exhibit G**. Wolf Lake's bank statements with First Bank (Exhibit G) reveal that before MII Huron loans to the Wolf Lake, Wolf Lake had zero dollars in its First Bank checking account. The only amounts deposited into Wolf Lake's First Bank checking account during the period of December 18, 2020 through August 2021 was the $1,000,000 in loans by MII Huron to Wolf Lake. What that means, of course, is that all monies that were paid / distributed to McCall, Lopez, and Rodriguez during that time period were derived directly from MII Huron's $1,000,000 in loans..

14. On May 27, 2021, Wolf Lake purchased property known as Lot 2. **Exhibit H**. The funds utilized to purchase Lot 2 were derived directly from MII Huron's loans to Wolf Lake. McCall Tr. at 29:3-14; *see also* **Exhibit G**.. Wolf Lake thereafter began to construct a home on Lot 2, even though Lot 2 was not the subject of the Huron Loan documents. On August 20, 2021, Wolf Lake purchased the Mountain Meadows tract. **Exhibit I**. MII Huron's funds were used to purchase the tract. Lopez Tr. at 77:2-5; *see also* **Exhibit G**.

15. In a letter dated October 30, 2021, Rodriguez acknowledged receipt of the MII Huron loan installments. **Exhibit B**.[1] In that same letter, Rodriguez represented that the Project was free and clear from any liens.[2] This representation was undisputedly false. The Project was subject to the lien of Juan Fernandez. **Exhibit J**; Lopez Tr. at 83:23-85:3.

16. Shortly thereafter, O'Neal Land Company conveyed Lot 3B to Wolf Lake for no consideration. **Exhibit K**. On February 27, 2023, Lopez emailed David Lane and represented that the properties were free and clear from any liens. **Exhibit L**. Again, this was false. These were not the only misrepresentations about the Project. They also misrepresented when the Project would be completed. *See* **Exhibit M**; Lopez Tr. at 49:11-50:13; 53:18-56:17.

17. Wolf Lake has never paid any interest or principal to MII Huron on account of the Huron Loan. Lopez Tr. 19:4-12.

### C. Undercapitalization and Inability to Obtain Outside Financing

18. From its inception, Wolf Lake was grossly undercapitalized relative to the scope of its development plans. The company had minimal paid-in capital and relied entirely on non-

---

[1] Wolf Lake's First Bank bank statements also show the deposit of MII Huron's three loans to Wolf Lake totaling $1,000,000. **Exhibit G**.

[2] The October 30, 2021 letter (**Exhibit B**) is written in Spanish. The last sentence of that letter states: "El lunes, nuestra oficina la enviara la informacion de Jackson County en cual demuestra que el terreno esta libre de gravamenes y a nombre de nuestra empresa, Wolf Lake Development." Upon information and belief, this translates to: "On Monday, our office will send you the information form Jackson County showing that the land is free of liens and is in the name of our company Wolf Lake Development."

traditional loans and member advances to fund operations. Lopez testified that Wolf Lake engaged in "countless meetings and appointments and conversations" to move the Project forward, but nothing ever materialized. Lopez Tr. at 88:1-23.

### D. The McCall and Lopez Advances

19. Balance sheets prepared by Beth McCall reflect purported loans from the insiders to Wolf Lake. As of December 31, 2023, these included:

- "Jaime loan" of $162,190
- "O'Neal loan" of $160,367.56

**Exhibits N and O.**

20. Lopez testified that he personally "put in" $162,000 in the form of checks written "to try to complete the project." He confirmed these advances were made after Wolf Lake had received all funds from MII Huron. Lopez Tr. at 72:9-73:23. McCall similarly confirmed he had advanced funds to Wolf Lake (McCall Tr. at 47:10-12), though specific amounts varied between balance sheet dates. As outlined *supra*, in the Debtor's bankruptcy schedules, McCall is listed as a creditor for $142,793.33, and Lopez $164,680.65. No explanation is given for the differences between their claims and the balance sheet amounts.

21. Neither the McCall advance(s) nor the Lopez advance(s) were evidenced by promissory notes, had fixed maturity dates, required periodic payments, bore stated interest rates, or were secured by collateral. McCall Tr. at 46:12-47:12; Lopez Tr. at 72:9-73:23. Lopez characterized the advances as "just money that I wrote checks for to try to complete the project" and acknowledged they were "personal investments to complete the project." When asked whether these amounts would be repaid, Lopez stated: "Whether we get that money out or not, that's on us." Lopez Tr. at 73:19-23. Similarly, in an email dated January 15, 2023, Lopez wrote: "We are committed to paying Olga back her full investment with interest once the home is sold whether we make money or not." **Exhibit P**.

### E. Project Failures and Bankruptcy

22. Despite the infusion of $1.4 million from MII Huron and Juan Fernandez, plus the aforementioned insider advances, Wolf Lake failed to complete its development projects or generate revenue. The home on Lot 2 remains incomplete, requiring an estimated $200,000 to $250,000 in additional work. The Mountain Meadows tract remains largely undeveloped despite some clearing and road work. Lopez Tr. at 39:3-15; 44:24-45:13; 46:10-19.

## II. LEGAL STANDARD

23. Courts in the Fourth Circuit have employed an eleven-factor test to determine whether a purported loan should be recharacterized as an equity contribution. *Va. Broadband, LLC v. Manuel*, 538 B.R. 253 (W.D. Va. 2015), *Carolina Shores, LLC v. Dixon (In re Daufuskie Island Props., LLC)*, 431 B.R. 649 (D.S.C. 2010). These factors examine "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest

payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments." *Va. Broadband*, 538 B.R. at 266.

24. "None of these factors is dispositive and their significance may vary depending upon the circumstances." *Va. Broadband*, 538 B.R. at 266 (quoting *Fairchild Dornier*, 453 F.3d at 233). The factors "are aimed at determining the intent of the parties at the time they entered into the loan transaction, which is the overarching inquiry in determining whether the true character of an investment is either a loan or an equity contribution." *Carolina Shores*, 431 B.R. at 655.

25. The test examines "whether the transaction appears to reflect the characteristics . . . of an arm's length negotiation." *In re Tiger Aircraft, LLC*, 2010 Bankr. LEXIS 2353 at *6 (N.D. W.Va. Aug. 6, 2010). "The more likely [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt." *Id.*

26. Importantly, post-transaction conduct is relevant to the recharacterization inquiry as evidence of the parties' intent at the time of the transaction. *Fairchild Dornier*, 453 F.3d at 234-235. Courts may consider the transferor's continuing failure to demand repayment and the parties' overall course of dealing as probative of whether the advance was intended as equity rather than debt.

## III. ARGUMENT

### A. Application of the Fourth Circuit Eleven-Factor Test Compels Recharacterization

27. When the above factors are applied to the undisputed facts established through deposition testimony and documentary evidence, each factor either favors recharacterization or is neutral. No factor supports treating the McCall and Lopez advances as bona fide debt. Taken together, the factors compel the conclusion that these advances were capital contributions by owners and insiders hoping to salvage their investment, not loans by disinterested creditors expecting repayment on commercial terms.

#### 1. <u>The Names Given to the Instruments Evidencing the Indebtedness</u>

28. The first factor examines whether the parties created formal loan documentation reflecting the characteristics of commercial debt. "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625, 631 (6th Cir. 1986).

29. Here, no promissory notes, loan agreements, or other written instruments evidence the McCall and Lopez advances. Lopez testified that his $162,190 advance was "just money that I wrote checks for to try to complete the project." Lopez Tr. at 72:24-73:23. He confirmed there

was no promissory note documenting the advance. Similarly, McCall provided no testimony suggesting any written agreement existed for his advances totaling over $160,000. In his deposition, McCall was shown a balance sheet reflecting a balance of $160,367.56 for his loan and asked if it was accurate. He could only respond, "Probably." McCall Tr. at 47:10–12; Exhibit O.

30. The characterization of these advances as "loans" on balance sheets prepared by Beth McCall, McCall's wife, does not create genuine loan instruments or alter the substance of the transactions. A unilateral accounting designation by an insider cannot transform an equity contribution into debt.

31. The absence of any formal loan documentation stands in stark contrast to the treatment of advances from outside creditors. MII Huron received written Guarantee Agreements evidencing MII Huron's loans to the Debtor and outlining repayment terms. As evidenced by Proof of Claim No. 1 filed, by Juan Fernandez, Mr. Fernandez apparently loaned $400,000 to the Debtor and the Debtor executed a promissory note dated August 2, 2021 to evidence the Debtor's obligation to repay that loan amount.[3] McCall and Lopez's failure to create similar documentation for their own advances reflects their and the Debtor's collective understanding that they were contributing capital as owners, not extending credit as lenders.

32. This factor weighs heavily in favor of recharacterization.

**2. <u>The Presence or Absence of a Fixed Maturity Date and Schedule of Payments</u>**

33. The second factor examines whether the purported loan had a definite maturity date and required periodic payments—hallmarks of genuine debt. "The absence of a fixed maturity date and a fixed obligation to repay indicates that the advances were capital contributions and not loans." *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625, 631 (6th Cir. 1986).

34. Neither the McCall nor Lopez advances had fixed maturity dates. Lopez's statement that "whether we get that money out or not, that's on us" reflects the understanding that recovery was contingent on project success, not guaranteed on a fixed date.

35. No evidence suggests the advances required periodic payments of principal or interest. Lopez testified that Wolf Lake made no payments to him on his advance. Lopez Tr. at 73:19-74:4. McCall similarly confirmed he received no payments on his purported loan. McCall Tr. at 10:18-23. The open-ended, indefinite nature of these advances is characteristic of equity capital, which remains in the enterprise until distributed as profits or liquidating distributions.

36. The contrast with outside creditor treatment is again instructive. MII Huron's Guarantee Agreements contemplated specific project milestones and repayment tied to property sales. Similarly, Juan Fernandez obtained a promissory note secured by a deed of trust. McCall and Lopez, by contrast, imposed no payment deadlines and made no demands for repayment despite years passing with no payments made.

---

[3] Curiously, Wolf Lake's bank statements for its First Bank checking account do not reflect any deposit of the Juan Fernandez loan proceeds. *See* **Exhibit G**.

37. This factor strongly favors recharacterization.

**3. <u>The Presence or Absence of a Fixed Rate of Interest and Interest Payments</u>**

38. The third factor assesses whether the advance bore a stated interest rate and required periodic interest payments. True loans typically compensate lenders through interest; equity investments compensate owners through distributions contingent on profitability. "The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625, 631 (6th Cir. 1986).

39. The McCall and Lopez advances were never reduced to writing, so therefore there is no agreement providing for interest. Lopez Tr. at 72:9-74:5. The balance sheets list the advances without any interest component. **Exhibits N and O.**. Wolf Lake made no interest payments to McCall or Lopez during the project's operation.

40. Again, the treatment differs markedly from outside creditors. MII Huron's loans bore interest at 13% per annum and were documented. **Exhibits C and D**. The insiders' willingness to advance funds without interest—while simultaneously negotiating interest-bearing terms for outside creditors—demonstrates they understood their advances as capital contributions, not commercial loans entitled to a return regardless of project success.

41. The absence of any interest obligation or payment strongly supports recharacterization.

**4. <u>The Source of Repayments</u>**

42. The fourth factor examines whether repayment was expected from cash flow or only from refinancing or liquidation. Loans typically contemplate repayment from operations; equity is repaid only from sale proceeds or distributions. The record establishes that no repayment source existed other than eventual sale of the properties. Wolf Lake generated no operating income from which to service debt.

43. The dependence on asset liquidation for any recovery confirms the equity nature of the advances. Equity investors accept the risk that they may recover nothing if the venture fails or properties cannot be sold at sufficient values. That is precisely the risk McCall and Lopez accepted when they advanced funds to the struggling development company they owned and managed.

44. This factor favors recharacterization.

**5. <u>The Adequacy or Inadequacy of Capitalization</u>**

45. The fifth factor examines whether the entity had sufficient equity capital relative to its debt and business operations. Wolf Lake was severely undercapitalized from inception. The company was formed with minimal paid-in capital for the specific purpose of undertaking real estate development requiring well over $1 million in funding. **Exhibits N and O**. Wolf Lake acquired multiple properties, partially constructed a modular home, performed site work, and

engaged engineers and surveyors—all capital-intensive activities. The company's inability to meet its obligations to MII Huron and Fernandez—both creditors with documentation—demonstrates its capital inadequacy. Further, the balance sheets show that liabilities exceeded the company's assets. **Exhibits N and O**.

46. When a business is organized with insufficient capital and insiders advance funds to fill the gap, those advances should be treated as the capital contributions they substantively are. *Accord In re Virginia Broadband, LLC,* 521 B.R. 539 (Bankr. W.D.Va. 2014) ("Lending to an inadequately capitalized entity favors recharacterization of debt as an equity contribution.")

47. This factor strongly supports recharacterization.

**6. <u>The Identity of Interest Between the Creditor and the Stockholder</u>**

48. The sixth factor assesses whether the purported creditor is an insider with ownership and control. Complete identity of interest between creditor and debtor suggests the advance was made to protect an equity investment rather than as an arm's-length loan.

49. McCall and Lopez are not merely insiders—they are the company. Along with Rodriguez, they are the three equal members of Wolf Lake, with Lopez serving as managing partner. They controlled all business decisions, approved all expenditures, and determined company strategy.

50. McCall's and Lopez's advances were made to protect their ownership interests in a failing venture, not as disinterested creditors expecting repayment on par with other creditors.[4] This is precisely the scenario where recharacterization is appropriate.

51. This factor favors recharacterization.

**7. <u>The Security, if Any, for the Advances</u>**

52. The seventh factor examines whether the advance was secured. True creditors typically seek security for significant loans; equity investors do not.

53. Neither McCall nor Lopez took any security interest in Wolf Lake's assets. Lopez testified that no collateral was provided for his advance. This stands in stark contrast to outside creditors: MII Huron obtained guarantee agreements identifying specific properties as collateral (**Exhibits C and D**), and Juan Fernandez obtained a recorded deed of trust (**Exhibit J**). At his deposition, Lopez testified that it was his understanding that MII Huron's loans were to be secured by the Debtor's real property. Lopez Tr. at 32:23-33:7. Similarly, in his January 15, 2023 e-mail (**Exhibit P**), Lopez wrote: "Cona Olga's investment is secured with the land, completed and paid for home, site work and engineering." Likewise, at his deposition, McCall likewise testified that MII Huron's loans were to be secured by the Debtor's real property. McCall Tr. at 40:9-15.

---

[4] Again, in an email dated January 15, 2023, Lopez wrote: "We are committed to paying Olga back her full investment with interest once the home is sold whether we make money or not." **Exhibit P**.

54. The insiders' failure to secure their advances—while simultaneously ensuring outside creditors received security—reveals their understanding that they were providing equity capital, not loans. Lenders protect themselves with security interests.; equity holders do not.

55. This factor strongly favors recharacterization.

### 8. <u>The Corporation's Ability to Obtain Financing from Outside Lending Institutions</u>

56. The eighth factor considers whether the company could have obtained funding from institutional lenders. The fact that no institutional lenders would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans. *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 752 (6th Cir. 2001).

57. Wolf Lake had no ability to obtain outside financing. Lopez testified to "countless meetings and appointments and conversations" attempting to secure financing or investment, all of which were unsuccessful. Lopez Tr. at 88:1-23. The company engaged auction companies, brokers, marketing firms, and multiple prospective investors, but no transactions closed.

58. The absence of traditional outside financing underscores that Wolf Lake depended entirely on its insiders for capital. When a company cannot borrow on commercial terms, insider advances to keep it operating are properly characterized as equity contributions.

59. This factor strongly supports recharacterization.

### 9. <u>The Extent to Which the Advances Were Subordinated to the Claims of Outside Creditors</u>

60. The ninth factor examines whether the purported loan was subordinated to outside creditors—a characteristic of equity.

61. Because the advances by McCall and Lopez, and the Debtor's purported obligation to repay those advances, are not evidenced by any writing, it is difficult or impossible to know whether such advances were formally subordinated to claims of outside investors. Having said that, as outlined *supra*, neither McCall nor Lopez ever received any repayment by the Debtor for such advances, which evidences the fact that, in the Debtor's own mind, any repayment on such advances was subordinate to the Debtor's legitimate debt obligations to non-insiders. *See* **Exhibit P** ("We are committed to paying Olga back her full investment with interest once the home is sold whether we make money or not.").

62. This voluntary subordination reflects the equity character of the advances. The Debtor, McCall and Lopez accepted that outside creditors would be paid first—as equity holders must.

63. This factor favors recharacterization.

### 10. The Extent to Which the Advances Were Used to Acquire Capital Assets

64. The tenth factor assesses whether funds were used for capital assets or working capital. Funds used for permanent improvements and long-term assets are more likely equity contributions.

65. Lopez acknowledged that funds were used "to try to complete the project"—a capital development endeavor, not working capital for ongoing operations. Lopez Tr. at 73:1-13. The balance sheets reflect expenditures on land, structures, and site improvements. **Exhibits N and O.**

66. This factor strongly supports recharacterization.

### 11. The Presence or Absence of a Sinking Fund to Provide Repayments

67. The eleventh factor considers whether the company maintained a sinking fund or reserve for loan repayment. The absence of such a fund suggests the advance was equity.

68. Wolf Lake maintained no sinking fund or reserve for repayment of the McCall and Lopez advances. The company made no payments and set aside no funds for this purpose. Indeed, the company made no payments to any creditor, including MII Huron. All funds were used for development activities or operating expenses (and to line the insiders' pockets with management fees), with nothing reserved for debt service.

69. The absence of any repayment mechanism confirms the McCall and Lopez advances were equity contributions, not loans requiring scheduled repayment.

70. This factor favors recharacterization.

## B. Policy Considerations Support Recharacterization

71. Beyond the eleven-factor analysis, broader policy considerations support recharacterization. The Bankruptcy Code establishes a priority scheme in which equity holders are subordinate to creditors. This scheme would be undermined if insiders could contribute capital to their own ventures, label it as debt, and then claim priority over true creditors when the venture fails.

72. Allowing insiders to recharacterize their equity contributions as debt post-failure creates moral hazard. It encourages undercapitalization, as insiders can contribute minimal capital, fund operations through purported loans, and claim creditor status if bankruptcy occurs. This harms genuine creditors who extend credit in reliance on the priority rules.

73. The Fourth Circuit has recognized that recharacterization authority is "essential to the implementation of the Code's mandate that creditors have a higher priority in bankruptcy than those with an equity interest." *Fairchild Dornier*, 453 F.3d at 233. Permitting the McCalls and Lopez to claim debt status would elevate their claims to the same priority level as MII Huron and other creditors, despite the fact that they contributed capital as owners to an admittedly

undercapitalized venture that could obtain no outside financing (and no doubt used MII Huron's money to make those advances).

74. The equitable principles underlying bankruptcy require that those who contribute capital as owners bear the risks of ownership, including subordination to creditors. McCall and Lopez enjoyed the benefits of ownership—control over all business decisions, salaries while funds permitted, and potential upside if projects succeeded. They cannot now claim creditor status to avoid the downside risks they accepted as equity holders.

## IV. CONCLUSION

75. The undisputed facts established through deposition testimony and documentary evidence demonstrate that the advances made by McCall and Lopez to Wolf Lake Development, LLC were equity contributions, not bona fide loans. Every factor in the Fourth Circuit's eleven-factor test either favors recharacterization or is neutral. No factor supports treating these advances as debt.

76. The advances were not evidenced by promissory notes or loan agreements. They had no fixed maturity dates, required no payments, bore no interest, and were completely unsecured. They were made by member insiders with complete identity of interest in an admittedly undercapitalized company that could not obtain outside financing. The advances were made to keep the Project going. The insiders made no demands for repayment, set aside no funds for repayment, and voluntarily subordinated themselves to outside creditors. They characterized their advances as "personal investments" and acknowledged that "whether we get that money out or not, that's on us."

78. These are the hallmarks of equity contributions by owners hoping to salvage their investment, not loans by disinterested creditors expecting repayment on commercial terms. The Court should exercise its equitable authority to recharacterize these advances as equity and subordinate the claims of the McCalls and Lopez to those of true creditors, including MII Huron Holdings, SA. Particularly since the insiders no doubt used some portion of MII Huron's loan to make the advances (after having paid themselves management fees from such funds), and McCall even used MII Huron's funds to pay off debt he owed arising from a prior fraudulent transfer judgment.

WHEREFORE, MII Huron Holdings, SA respectfully requests the Court as follows:

1. That the scheduled general unsecured claims of O'Neal McCall and James Fernando Lopez be disallowed as general unsecured claims and recharacterized as equity; and

2. That MII Huron be granted such other and further relief as this Court deems appropriate and just.

Respectfully submitted, this the 28th day of July 2026.

s/ Daniel C. Bruton_
DANIEL C. BRUTON
State Bar No. 22440
dbruton@belldavispitt.com
Joshua Durham
State Bar No. 25414
jdurham@belldavispitt.com
Attorneys for MII Huron Holdings, SA

OF COUNSEL:

BELL, DAVIS & PITT, P.A.
Post Office Box 21029
Winston-Salem, NC 27120-1029
Telephone: 336-722-3700

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| WOLF LAKE DEVELOPMENT LLC | ) | Case No. 26-10031 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**NOTICE OF OPPORTUNITY FOR HEARING**
**(No Protest Notice – No Hearing Will be Held Unless Request for Hearing is Filed)**

PLEASE TAKE NOTICE that MII Huron Holdings, SA has filed an Objection by MII Huron Holdings, SA to Scheduled General Unsecured Claims of James Fernando Lopez and O'Neal McCall (the "Objection").

PLEASE TAKE FURTHER NOTICE that your rights may be affected by the Objection. You should read the Objection carefully and discuss it with your attorney. If you do not have an attorney, you may wish to consult with one.

PLEASE TAKE FURTHER NOTICE that in order for a hearing to be held on the Objection, written responses, if any, must be filed on or before **August 17, 2026** (the "Response Deadline") in order to be considered. If you do not want the Court to grant the relief requested in the Motion, or if you oppose it in any way, you MUST:

(1) File a formal, written a response with the Bankruptcy Court at:

Clerk, United States Bankruptcy
Court Charles Jonas Federal Building
401 West Trade Street
Charlotte, North Carolina 28202

(2) Serve a copy of your response on all parties in interest, including:

U.S. Bankruptcy Administrator
402 West Trade Street
Charlotte, NC 28202

Daniel C. Bruton
Bell Davis & Pitt, PA
P.O. Box 20129
Winston-Salem, NC 27120-1029

Richard S. Wright
Moon Wright & Houston, PLLC
212 N. McDowell Street
Suite 220
Charlotte, NC 28204

PLEASE TAKE FURTHER NOTICE that IF RESPONSES ARE TIMELY FILED, a hearing on the Objection will be held before The Honorable George R. Hodges at the United States Bankruptcy Court, 100 Otis Street, Room 112, Asheville, North Carolina on **September 15, 2026 at 10:30 A.M. (ET).**

PLEASE TAKE FURTHER NOTICE that, if you or your attorney do not file a written response to the Objection on or before the Response Deadline, the Court may grant the relief requested in the Objection without a hearing. No further notice will be given.

This the 28th day of July, 2026.

s/ Daniel C. Bruton
DANIEL C. BRUTON
State Bar No. 22440
dbruton@belldavispitt.com
Joshua Durham
State Bar No. 25414
jdurham@belldavispitt.com
Attorneys for MII Huron Holdings, SA

OF COUNSEL:

BELL, DAVIS & PITT, P.A.
Post Office Box 21029
Winston-Salem, NC 27120-1029
Telephone: 336-722-3700
Facsimile: 336-748-2890

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| WOLF LAKE DEVELOPMENT LLC | ) | Case No. 26-10031 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I certify that I served the *Objection by MII Huron Holdings, SA to Scheduled General Unsecured Claims of James Fernando Lopez and O'Neal McCall* and *Notice of Opportunity for Hearing* by electronic notification on those parties registered with the United States Bankruptcy Court, Western District of North Carolina ECF system to receive notices and on the parties listed via U.S. Mail on July 17, 2026.

Richard Wright rwright@mwhattorneys.com
Attorney for Debtor

Robert Mays rmays@maysjohnsonlaw.com
Subchapter V Trustee

Mark Pinkston mpinkston@vwlawfirm.com
Attorney for Juan Fernandez

US Bankruptcy Administrator

O'Neal McCall
61 N. Oak Street
Brevard, NC 28712

Jamie Lopez
300 Long Shoals Rd.
Apt. 2C
Arden, NC 28704

This the 28th day of July, 2026.

s/ Daniel C. Bruton
DANIEL C. BRUTON
State Bar No. 22440
dbruton@belldavispitt.com

STATE OF NORTH CAROLINA IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

COUNTY OF JACKSON FILE NO. 25 CV 000462-490

MII HURON HOLDINGS, SA, )
)
Plaintiff, )
)
vs. )
)
WOLF LAKE DEVELOPMENT, LLC,)
O'NEAL LAND COMPANY, LCC. )
)
Defendants. )
_______________________________)

30(b)(6) DEPOSITION
FOR
WOLF LAKE DEVELOPMENT, LLC
OF
JAIME FERNANDO LOPEZ
(Taken by Plaintiff)
Asheville, North Carolina
October 29, 2025

Reported by Julie B. Surles

Verbatim Court Reporter, Notary Public

Transcript produced by computer-aided transcription



EXHIBIT
tabbies
A

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

MR. JOSHUA B. DURHAM, Esquire
MS. LANE GARDNER, Esquire
Bell, Davis & Pitt, P.A.
227 West Trade Street, Suite 2160
Charlotte, North Carolina 28202
Jdurham@belldavispitt.com

ON BEHALF OF DEFENDANTS:

MR. STEPHEN BARNWELL, Esquire
Barnwell & Long, PLLC
Post Office Box 430
Skyland, North Carolina 28776
stephen@barnwellandlong.com

ALSO PRESENT:

ONeal McCall
Beth McCall



This is the 30(b)(6) DEPOSITION of JAIME FERNANDO LOPEZ, a witness called on behalf of Plaintiff, being taken before Julie B. Surles, Verbatim Reporter and Notary Public, and pursuant to North Carolina Rules of Civil Procedure, at the offices of Barnwell & Long, 2000 Hendersonville Road, Suite A, Asheville, North Carolina, on the 29th day of October, 2025 beginning at 9:14 A.M.



INDEX OF EXAMINATIONS

PAGE
BY MR. DURHAM. . . . . . . . . . . . 6



INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice | 6 |
| Exhibit 2 | Email | 10 |
| Exhibit 3 | Letter | 16 |
| Exhibit 4 | Email with Attachments | 19 |
| Exhibit 5 | Guarantee Agreement | 30 |
| Exhibit 6 | Guarantee Agreement | 30 |
| Exhibit 7 | Investment Agreement | 47 |
| Exhibit 8 | Email Chain | 48 |
| Exhibit 9 | Email Chain | 51 |
| Exhibit 10 | Email Chain | 57 |
| Exhibit 11 | Email Chain | 61 |
| Exhibit 12 | Email Chain | 66 |
| Exhibit 13 | Email Chain | 77 |
| Exhibit 14 | Deed of Trust of Future Advances | 79 |
| Exhibit 15 | Partial Release | 81 |
| Exhibit 16 | General Warranty Deed | 81 |
| Exhibit 17 | Email Chain | 83 |
| Exhibit 18 | Email Chain | 85 |
| Exhibit 19 | General Warranty Deed | 91 |
| Exhibit 20 | Email Chain | 93 |
| Exhibit 21 | WhatsApp Messages | 94 |
| Exhibit 22 | Text Messages | 97 |
| Exhibit 23 | Email Chain | 98 |

Page 6

JAIME FERNANDO LOPEZ,
having been first identified and duly sworn was examined and testified as follows:

EXAMINATION

BY MR. DURHAM:
Q. Okay. Make sure you keep your voice up for me. Could you please state your name for the record?
A. Jaime Fernando Lopez.
Q. And, Mr. Lopez, you are here today to give testimony in a case -- let me back up. I'm Josh Durham. I'm the attorney for MII Huron Holdings. This is my colleague Lane Gardner of our office. We've brought an action against Wolf Lake Development and ONeal Land Company. You're familiar with that litigation?
A. I am.
Q. Okay. And I understand you were here to give testimony on behalf of Wolf Lake Development, LLC. Is that correct?
A. Correct.
Q. Okay. I'm going to show you what I'm marking as Exhibit 1.
(EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION)
Q. And that's the Notice of Deposition that we have served in this case. Have you seen this before?
A. I have.

Page 7

Q. Okay. And on the last page of Exhibit 1 is a list of topics that we've indicated that we would like to ask about. You've seen that list before?
A. Correct.
Q. Okay. And are you prepared to testify as a representative of Wolf Lake on the topics 1 through 19?
A. I am.
Q. Have you ever had your deposition taken before?
A. No.
Q. Okay. You might have discussed this with Mr. Barnwell, but I'm sort of compelled to give some basic ground rules. Our court reporter here is taking down a record of everything that I say and that you say and that anybody else says here today. So it's important that we not talk over each other. And we'll try our best, but sometimes you might know, think you know where my question is going and you'll want to jump in. That makes her job harder. And I might get anxious for my next question and not let you finish. So as long as we can stay separate, it makes her job a lot easier.
My hearing is terrible, so I would ask that you just try to speak up so I don't have to ask you the same question over and over again. And along those lines, it's hard for a court reporter to take down head nods and head shakes and huh-uhs and uh-uhs. so we could just

Page 8

make sure we verbalize our answers. Does that make sense?
A. It does.
Q. Okay. If at any point you want to take a bathroom break, just let me know. I do ask that if I've got a question pending, let's maybe finish that sort of topic, and then we can take a break. Does that make sense?
A. It does.
Q. Okay. And if at any time you don't understand my question, please ask me to rephrase it. And the reason that's important is because months from now we might be looking at this transcript. And if you say at that time, well, I didn't really understand the question. It just makes everybody's job harder. So let's get a good clean record. Does that all make good sense?
A. It does.
Q. Okay. What is Wolf Lake Development? What's the business? What does it do?
A. It's a real estate development company.
Q. How long has it been in existence?
A. Four years. Now.
Q. Is this the, this project that's the subject of this litigation, is that the only real estate development that Wolf Lake has been involved in?

Page 9

A. It is.
Q. And was it formed specifically for this particular project?
A. It was.
Q. Who were the owners of Wolf Lake?
A. Owners of Wolf Lake are Jaime Lopez, ONeal McCall and Manuel Rodriguez.
Q. And Mr. McCall is present in the room with us today?
A. He is.
Q. Okay. And Mr. Rodriguez, does he live in Florida?
A. He does.
Q. Okay. How did it -- had you worked with Mr. McCall before this particular project?
A. Yeah, we had worked and discussed opportunities. We got a land piece and entitled together and we developed a relationship after that.
Q. And the land that you got titled, is that this particular property?
A. It is not.
Q. Okay, what property was that?
A. It is a property out in Cullowhee.
Q. Did that have a project name?
A. I don't recall what they ended up eventually

Page 10

calling the project. Again, the job was to just go and get it entitled and. And then the owners would take over from there.
Q. How long ago was that?
A. That was about five years ago.
Q. And was Mr. McCall and Mr. Rodriguez involved in that?
A. Only Mr. McCall.
Q. How did you come to make the acquaintance of Mr. Rodriguez?
A. A family friend.
Q. And how long have you known him?
A. Fifteen years.
Q. Have you done any real estate development title acquisition with Mr. Rodriguez before this job?
A. No.
Q. Let's mark as -- showing you what I'm marking as Exhibit 2. Have you ever seen Exhibit 2 before?
(EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION)
A. Yeah, I do recall it, yeah.
Q. If you could just -- what does the -- there's some text in Spanish from Mr. Lane on October 19, 2021. What is he saying there?
A. Number one, proposed to develop land in North Carolina and Alabama. He names myself and Manny

Page 11

Rodriguez, Manuel Rodriguez. Included our photos of homes in the area with a property in Alabama that we never worked with -- with MII Holdings.
Q. And this is October of '21 so this is after the project that's involved in our lawsuit was underway, correct?
A. Correct.
Q. Okay. But if you could flip through Exhibit 2, there's a resume for yourself right after the last picture. Do you see that?
A. Yep.
Q. Okay. And did you prepare this resume? I did. Okay. And I just want to run through some of these experiences. It's got Wolf Lake Development, Managing Partner. Do you see that?
A. Yes.
Q. Okay. Are you the managing partner for Wolf Lake?
A. I am.
Q. Does Mr. McCall and Mr. Rodriguez have any official titles?
A. They are part of the LLC, yes.
Q. Do they have president, CEO, you know, assistant managing partner type titles at all?
A. No titles, just equal partners.

Page 12

Q. Okay. And it says new construction, five single family residences in Jackson County. Do you see that?
A. I do.
Q. Was the plan, I've seen something about eight houses, maybe nine at some point. What was the plan for this project?
A. The plan was to get as many homes as we can get entitled on the land. But we -- we had, we believe that we can eventually get five homes.
Q. All right. And what -- there are, I've seen, there are a number of different tracks that I've seen across the documents. The five homes, which tracks are they going on or was the plan for them to go on?
A. That was lot 1, lot 3B.
Q. There's also a much larger track.
A. Correct.
Q. What was the plan for that one?
A. The plan for that one was we looked at doing, developing an RV park, and then we looked at doing more of an estate home project. And we also looked into a mixed use, smaller homes at the bottom with larger homes on the top.
Q. All right. I'm gonna come back to some of the Wolf Lake stuff, but the W.W. Valle Verde, LLC, that next

Page 13

project listed, what was that project about?
A. That project, I got it entitled. It was a project in Woodfin. I got it entitled for 115 combination single family and townhome residences. And that land was sold. And so we never developed.
Q. So when you say got a property entitled, what does that mean?
A. My business partners and I purchased the property. It was raw land. Went through the city of Woodfin, all of the processes and procedures to get the land entitled to build on it.
Q. Is it any rezoning that's necessary --
A. Yeah.
Q. -- getting all the approvals for through?
A. All of that. All of that.
Q. Okay.
A. Presentations before the boards, et cetera.
Q. Okay.
MR. BARNWELL: Can we go off the record just a minute?
MR. DURHAM: Sure.
(WENT OFF THE RECORD BRIEFLY)
Q. Was Mr. McCall and Mr. Rodriguez involved at all in the Valle Verde project?
A. Not at all.

Q. Okay. All right. Beyond the Cullowhee property you mentioned, the Wolf Lake project that we'll talk about more, and the Valle Verde, is there any other development or entitlement work that you've done in North Carolina at all?
A. I worked on, at Sunset Falls, and that was a, mostly on the entitlement side as well.
Q. Was Mr. McCall and Mr. Rodriguez, were they involved in that one?
A. They were not.
Q. I've seen some references to a Fletcher proposal for a community there. Do you know what that was about?
A. Just a piece of land that we were looking at to see the feasibility. It didn't go further than conversation.
Q. Who is Julio Palato (phonetic), Pallotto? Do you know that name?
A. Julio was one of the owners of Valle Verde.
Q. Okay. Is he involved at all in Wolf Lake?
A. Not at all.
Q. Okay. Do you have any ownership or official role with the McCall Land Company or the ONeal Land Company? Sorry.
A. I do not.



Q. Okay. Do you know who Olga is?
A. I do.
Q. Okay. Who is that?
A. She is the investor on both the large tract and the smaller tracts.
Q. And had you ever worked with her before?
A. I had not.
Q. Who is David Lane?
A. Manuel Rodriguez had met David Lane in Miami, and he informed us that he possibly had an investor that would be interested in doing business, and he connected us with Olga.
Q. Did Wolf Lake or ONeal Land Company, to your knowledge, have any kind of written agreement with David Lane or his company?
A. It did not.
Q. Do you know if he received any compensation as part of the Wolf Lake project?
A. I think, yeah, he received a finder's fee of $15,000.
Q. And who paid that finder's fee?
A. We did.
Q. "We," Wolf Lake?
A. Yes.
Q. Do you know when that was paid?



A. Early on in the process.
Q. As I recall, and we'll look at this, there were three different dates on which Wolf Lake received funds from my client. Do you know when the finder's fee was paid in relation to this?
A. I do not.
Q. Would there be some kind of record that you could look at and find that out?
A. I'm sure.
Q. Would that be a bank record? QuickBooks?
A. Correct.
Q. Okay. Does Wolf Lake run QuickBooks, do you know? Or what kind of accounting system? If you know, you know. If not --
A. I don't know.
Q. We'll flag it for asking your partner there. Have you worked with David Lane on any other project besides the Wolf Lake project?
A. No.
Q. Regarding those three funding dates that I mentioned --
MR. DURHAM: Can you give me 9?
Q. Show you what I'm marking as Exhibit 3.
(EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION)
Q. It appears to reference -- this appears to be



correspondence from Mr. Rodriguez to Olga confirming receipts of funds. Is that the case?
A. It is.
Q. Okay. And it references three payments, One on January 11th, 2021, February 25th, 2021, and August 9th, 2021. Is that correct?
A. Correct.
Q. Does that seem correct as to when Wolf Lake received the funds from my client?
A. It does.
Q. Okay. What does the -- after, there's a paragraph after that last payment of $500,000, what does that say?
A. "Interests are calculated annually."
Q. At an interest rate of 13 percent?
A. Correct. Guaranteeing 13 percent for the first year.
Q. And then if you could translate that last paragraph for me.
A. "This document establishes the interest rate at 13 percent annually."
Q. What about the -- do you see the paragraph that mentions Jackson County?
A. Yep.
Q. What does that whole section say?

Page 18

A. "On Monday, we will send to you information from Jackson County that the land is free." I don't know what the word -- is in our name, Wolf Lake Development.
Q. Does that say that will show that our land is free of encumbrances?
A. It may. I don't know that word. I really don't.
Q. Okay. Do you know what land that's talking about?
A. I'm positive for a fact that it was the smaller parcels, the 3B and the one for a fact. I don't know if it's all the land.
Q. What was the, what was the purchase of the million dollars that was loaned by my client?
A. I don't understand the question.
Q. Yeah, I mean, what was -- wow was that money going to be used?
A. For entitlement, road work, infrastructure, soft sales cost, acquisition of land.
Q. Do you know if Wolf Lake already had the property before each of these disbursements were made?
A. No.
Q. And the activities you mentioned, entitlement work, infrastructure, all of those things, was that for the smaller parcels or is it for work on the larger

Page 19

parcel or the RV park and those things that you mentioned as well?
A. It's for both.
Q. Okay. And has Wolf Lake paid back any of the million dollars that it borrowed?
A. No.
Q. Would you agree this was a loan?
A. I do.
Q. Okay. And bearing interest at 13 percent?
A. I do.
Q. Has Wolf Lake paid any interest amount back?
A. Have not.
Q. What, in your mind are the repayment terms for this loan?
A. Repayment terms were 13 percent interest until the land was sold, and that's it.
Q. Handing you what I've marked as Exhibit 4 and ask if you've seen Exhibit 4 before?
(EXHIBIT NUMBER 4 WAS MARKED FOR IDENTIFICATION)
A. I don't recall.
Q. Do you recognize, there's a few pages in, there's some financial budget kind of document. And then there's a document that's titled the Residences of Wolf Lake, some color pictures and things. Do you see that?
A. Yeah. Uh-huh.

Page 20

Q. Is that the Wolf Lake -- do you know who prepared this document?
A. Who prepared the document was David Lane, made it pretty. We provided pictures and information.
Q. Did you see this presentation in finished format?
A. I did.
Q. Okay. And did you sign off on it?
A. We did.
Q. Okay. All right. So sort of, there's some general kind of area information, picture of a cute dog in the water. And then there's a description page with a house at the bottom, if you can find that, with a bunch of bullet points on it. It says, Description, "3 parcels consisting of" -- do you know what three parcels the 1.96, 1.90 and 1.80 acres, which particular lots those were?
A. I don't know. No, not right now.
Q. And then it says "Detached single family homes." Do you see that?
A. I do.
Q. Were these going to be built or prefabricated homes?
A. These were modular homes.
Q. Okay. So manufactured, some portion of them

Page 21

manufactured off site and then shipped in?
A. Correct.
Q. Okay. What kind of site work was going to be necessary to get that ready for the modular home?
A. Extensive land development and grading, creating a building pad, creating a driveway, clearing of the land and --
Q. (Inaudible)
A. Go ahead.
Q. Sorry.
A. No, no, go ahead.
Q. -- just making sure you finished all that.
A. Yeah, yeah.
Q. Who was going to be actually manufacturing the modular homes?
A. Cardinal Homes.
Q. Had you worked with Cardinal Homes before?
A. Personally, no.
Q. Do you know if ONeal had?
A. He had not.
Q. How did you come to identify Cardinal Homes?
A. Through an acquaintance that had purchased a few of the homes in the past.
Q. Who was that acquaintance?
A. I don't even recall his name. He was someone

Page 22

that worked for a real estate agent that I knew that in passing, said, hey, talk to these people. So that's how it happened.
Q. Did they send any kind of proposals and back and forth with them to figure out what you wanted them to manufacture?
A. Sure.
Q. And do you recall how much each of the homes was going to be that they were going to manufacture?
A. One in particular, the one that we have on site was going to be right around $250,000. But that was not all in. We would complete the roof and basement, plumbing, electrical, et cetera.
Q. Do you know what the hope on the all in was going to be on that one home?
A. The hope on the all in, we hoped would be in right around $600,000.
Q. Did you -- do you know if it was ever disclosed to my client that these were going to be modular homes?
A. It was disclosed.
Q. It was disclosed?
A. Yes.
Q. How do you know that for sure?
A. Because we, I had a conversation with her.
Q. Okay. With Olga?

Page 23

A. Yep.
Q. Okay. Do you know when in relation to those three dates, the loan dates that we looked at, that conversation was?
A. No.
Q. Are you aware of any email correspondence in which that was discussed?
A. No. Olga had built a modular home in Columbia herself, so she was familiar with what we were doing and in agreement.
Q. If you could keep looking through this document past the floor plans, there are some sort of parcel color, aerial photos, and I want to ask you about those, beginning with the one that's got 3A/B on it. First page after the last floor plan.
A. This one?
Q. No, Earlier. Right there (pointing). I think that's -- it says "The Development" at the top.
A. Right here?
Q. Yeah. The page that has The Development at the top there is a combined 3A/B, do you see that?
A. I do.
Q. Do you know why that's combined?
A. Just add more acreage.
Q. Do you know if, Wolf Lake did not own 3A, did

Page 24

it?
A. It did not.
Q. Okay. Who owned 3A?
A. I do not recall.
Q. Do you know why 3A was listed in this presentation if Wolf Lake didn't own it?
A. We had an agreement to purchase and ONeal would be better on that question in particular.
Q. Okay. Do you know if that agreement was in writing?
A. I do not know.
Q. Do you know if that agreement is still in effect?
A. I do not know.
Q. Wolf Lake has not purchased 3A though, correct?
A. Correct.
Q. And then over there is lot 1. I think you mentioned lot 1 earlier. And then if you could just keep going until there's an actual parcel, GIS parcel printout for, it says Lot 1, Wolf Lake Development. Do you see that?
A. I do.
Q. Okay. And that's one of the Wolf Lake properties that was going to be developed, correct?

Page 25

A. Yes.
Q. Okay. And then the next page, it's got lot 3A/B again. Do you see that?
A. I do.
Q. Okay. And then the next page is lot 3A that we just talked about. You see that?
A. I do.
Q. Okay. And then the page after that is lot 3B. Do you see that?
A. I do.
Q. Let me have you go back. There's a budget that's right after the first page on this Exhibit 4. If you could flip back to that. Do you know who prepared this budget?
A. ONeal.
Q. Okay. Did you have any hand in preparing or reviewing this budget?
A. Yes.
Q. Okay. What was your role in that?
A. Just going over costs and estimated costs and what we think. We thought we can, we can develop land and the homes for.
Q. Okay, let's start at the top. It's got two. It says single family home and then appears to be two of those and then six duplexes. Am I reading that right?

Page 26

A. Correct.
Q. Okay. And one of the reasons I asked you when we looked at your resume that it said five homes is because I'd seen six and two was eight.
A. Right.
Q. Explain to me that difference there.
A. This is just a proposal of what we thought we could get on the land.
Q. Okay.
A. This was raw land, so --
Q. And so maybe it was eight total in the beginning, but then it ultimately maybe went to five. Was that the more sort of realistic or am I just reading the eight wrong?
A. Again, you know, with raw land you never know.
Q. Okay.
A. You know, we've got septic and we got sewer and all that. These are all estimated on what we thought we can get out of the land.
Q. The land development Phase one, hard cost. What is Phase one?
A. Phase one was going to be preparing two of the lots and getting -- for getting homes on there, the single family homes.
Q. Which lots were those going to be?

Page 27

A. Lot number 1.
Q. Just lot 1, or would that be 1 and 3B?
A. It was going to be 1.
Q. Okay. And then what is phase two?
A. Phase two would then be the -- the rest of the proposed homes.
Q. On which lots?
A. 3B.
Q. And then so did the -- did the plan ultimately switch from a mix of single-family homes and duplexes?
A. It did.
Q. Okay. To just single-family homes?
A. Correct.
Q. Okay. There's mention of the soft cost. A little further down there's an entry for a GC. Do you see that?
A. I do.
Q. Who was the GC intended to be?
A. The GC was MJ Mountain Builders.
Q. Were they involved in the -- I understand one home was ultimately built?
A. Correct.
Q. Were they involved in that home?
A. They were.
Q. Okay. As the general contractor?

Page 28

A. They were.
Q. Do you know how much they were paid?
A. I do not.
Q. Do you know if there's a written agreement with MJ Mountain Homes for their services on this project?
A. The way that modular homes work with Cardinal is that the agreement is between MJ Mountain Builders and Cardinal. They don't -- we do not -- as owners, we cannot access really working with them. It's through the GC as everything is done and then we pay the GC.
Q. Do you have a written agreement with Cardinal? Do you have like a purchase order or how does that work?
A. We do, yes.
Q. Okay. Do you know how much Cardinal has been paid?
A. Not exactly. Over $250,000.
Q. Is Cardinal paid in full?
A. They are.
Q. Was there any work with Cardinal beyond the one home?
A. Not.
Q. Okay. The next item is Commission, five percent. What was that for?
A. That was an estimated commission on the sale of the home.

Page 29

Q. Okay. Like a realtor commissions?
A. Yes.
Q. What about Management?
A. That is salaries to be paid to the team.
Q. Have salaries -- okay. Who is the team?
A. Myself, ONeal McCall, Manuel Rodriguez.
Q. Anyone else?
A. No.
Q. And have salaries been paid to those three individuals?
A. They have.
Q. From out of the Wolf Lake entity?
A. Correct.
Q. Do you know how much they have been paid?
A. 40,000 to me, 100,000 to Manuel Rodriguez --
THE WITNESS: And ONeal? (Looks at Mr. McCall.) I don't recall.
Q. Do you know?
A. I don't recall.
Q. We'll make sure. Do you know if it was more than 40,000 or less than 40,000?
A. I don't know.
Q. Okay. Were these paid in regular occurrences or are these like year-end distributions? How did that work?

Page 30

A. Regular occurrences for a set number of months.

Q. Do you know how Wolf Lake decided what those amounts were going to be?
A. No.
Q. You know why Manny was paid more than you?
A. It was agreed by the partners, I imagine.
Q. I would think with you much more local to the project, you'd be more boots on the ground and more involved. Is that fair to say you were more involved in the project than Manny was?
A. I was.
Q. Do you know if Manny's ever been to the site?
A. He has.
Q. Do you know how many times?
A. At least a half a dozen times.
Q. Let me show you two documents which are the Guarantee Agreements. I'm going to mark -- let me show you while I finish fishing out the second one. Let me show you Exhibit 5. And I'll also hand you Exhibit Number 6 And I'm making a mess.
(EXHIBIT NUMBERS 5 and 6 WERE MARKED FOR IDENTIFICATION)
Q. Have you seen the Exhibits 5 and 6 before?
A. I have.
Q. And are these the Guarantee Agreements between

Page 31

Wolf Lake and my client?
A. They are.
Q. Okay. And these list Wolf Lake is the borrower and ONeal Land Company is the guarantor. Is that your understanding of the relationship, that sort of, Wolf Lake was the main debtor, but ONeal and Company was guaranteeing repayment?
A. Correct.
Q. Okay, let's look at Exhibit 6 first. And that's got two payments, $180,000 and $320,000. Do you see that right in the middle?
A. I do.
Q. Okay. Totaling $500,000, correct?
A. Correct.
Q. Okay. And then we looked on an earlier exhibit of those three payments and it did appear those were indeed loaned and received. Loaned by my client, received by Wolf Lake, correct?
A. Correct.
Q. Okay. And then it's got the next paragraph after the payments, there's a reference to a 13 percent per year, correct?
A. Correct.
Q. Now, what I don't see anywhere in Exhibit 6 is what you mentioned earlier, that it would be paid back

Page 32

when the property was sold. Are you aware of that in this Exhibit 6 at all?
A. It's not in the exhibit, but that was our understanding.
Q. Do you know who prepared Exhibits 5 and 6?
A. I do not.
Q. Okay. I believe my client understands it was somebody with either Wolf Lake or ONeal that drafted these and sent them to David Lane. Do you have any understanding of that?
A. I don't.
Q. Okay, on the -- just look at the last page of Exhibit 6 real quick. Is that your signature for Wolf Lake?
A. It is.
Q. And is that Mr. McCall's for ONeal Land Company?
A. It is.
Q. Let's look back at the first page of Exhibit 6. There's a section at the bottom called Guarantees, and it mentions lot 3B and lot 1. Do you see that?
A. I do.
Q. Okay. Do you know what the Guarantee, that heading means?
A. Those two lots were put up as a guarantee to

Page 33

the $500,000 total that was lent.
Q. Were they to be as collateral for that loan?
A. To my understanding, yes.
Q. Okay, so in other words, if for some reason Wolf Lake defaulted, then my client could foreclose on that. Is that your understanding?
A. Yes.
Q. At the very bottom, it says, "Model home with issued certificate of occupancy by Jackson county in the state of NC located on 3B." Do you see that?
A. I do.
Q. What was the -- there was no model home ever built on 3B?
A. No.
Q. What had been the thought, in a perfect world for how that would get done?
A. Well, in getting into the weeds, we determined that the best, easiest route would be not to build on 3B. It would be to build on the lot that we built.
Q. Which was lot 2?
A. Lot 2. Correct.
Q. And so explain to me then, what some of those weeds are that you got into for why you couldn't build on 1 or 3B but chose lot 2?
A. Lot 2 had direct access to the lake. You can

get a dock on it so there's more value in Lot 2. Land development was less steep. There was a driveway that led to lot 2 and 1 that was easier to navigate, to get our modular home in.
Q. When did you make that determination?
A. As we started to work on the land.
Q. Was it after you got funds from my client?
A. Correct.
Q. Do you know if that was ever communicated to Olga that you had decided not to build on 1 or 3B but lot 2 instead?
A. In conversation, yes and the reasons why.
Q. In phone conversations?
A. Yes.
Q. Between you and Olga?
A. Yes. Myself and Olga.
Q. Do you know if there was any written communication to that effect?
A. Were not.
Q. Do you know if there were any text messages about that?
A. I don't recall. I don't think so. We would have periodically, speak on the phone, would schedule a call.
Q. Was there ever any discussion about including



lot 2 as collateral for these loans?
A. Just that we were purchasing and including lot 2 and we will be building the home on there.
Q. Whose idea was it to originally include just Lot 1 and 3B as collateral on the first $500,000 loan?
A. I don't recall.
Q. Do you recall if there had been discussion about maybe including a lot 22 at some point?
A. No.
Q. Do you know when I say lot 22, do you know what that lot is?
A. Yeah, I do.
Q. Where is that in relation to 3B? Sort of below it on the map a little bit?
A. Yeah. It's not -- it's not attached. It's not connected in any way.
Q. Wolf Lake doesn't have lot 22 anymore?
A. No.
Q. Do you know who it sold it to?
A. I do not.
Q. Does a Lake Boys entity out of Florida ring a bell at all?
A. I don't know the entity. I don't know who eventually ended up buying that lot.
Q. It's not connected as far as you know, to Mr.



Rodriguez --
A. No.
Q. -- or any of the partners at all?
A. Connected in what way?
Q. Connected to you, Mr. McCall or Mr. Rodriguez at all? Do you know if they have any interest in --
A. No, they do not.
Q. Okay, but to your knowledge, was there a conversation with Olga in which you discussed, Hey, Olga, look, we've determined lot 2 is the better lot at all. We know we were giving you 1 and 3B as collateral. Let's go ahead and wrap up lot 2 in this as well. Did y'all ever discuss anything like that?
A. Yes.
Q. You did?
A. Uh-huh.
Q. Okay. And why wasn't that done?
A. What do you mean, why wasn't it done?
Q. Why wasn't lot 2 ever included as additional collateral?
A. Because it was after the fact. We had a verbal conversation. We never put it on paper.
Q. But did you say that she was somehow protected with lot 2 as well, or did she just say, don't worry about it?



A. No, we told her that she was protected with lot 2. Yes.
Q. How would she be protected on lot 2?
A. The home was built on lot 2.
Q. But there's no documentation at all as far as, you know, regarding lot 2 and my client?
A. Correct.
Q. Okay. Was it the model home built on lot 2, or was that going to be a home that you would -- let me just stop that there. Was that a model home you were building on lot 2?
A. It was a home for sale. Yeah.
Q. Okay. Would you consider that the model home?
A. Yeah.
Q. All right, let's look at that Exhibit 5. That also shows you the Other Guarantee Agreement. The same -- is this Exhibit 5 related to the larger track?
A. It is.
Q. And half a million dollars for my client for the -- how did this work? Was it half a million dollars for development of the homes, and then half a million dollars was supposed to go to development on the larger track?
A. Correct.
Q. Okay. So sort of separate purposes?

Page 38

A. Separate purposes.
Q. And do you know if there's anything in Exhibit 5 that has what we talked about, that the only repayment obligation is to repay it when the property is sold?
A. Correct.
Q. Okay. It's not in there as far as you know?
A. As far as I know.
Q. And again, Exhibit 5 probably already answered this, but you don't know who prepared Exhibit 5?
A. I don't.
Q. And then is that, I think there's signatures on the last page of -- actually a couple from the last. You see your signature as borrower on Exhibit 5 somewhere around there?
A. I do.
Q. And actually go to that next page. That is Attachment A, which got all the individual lots on there. Do you see that?
A. Uh-huh.
Q. Were these ever platted on record with the county, as far as you know?
A. They were not.
Q. Okay. They have since been subdivided a little bit in terms of the parcels. Are you aware of that?
A. Well, there were, there were parcels that were

Page 39

put together to make the larger piece, so that's how they were acquired.
Q. Okay. What development has occurred with regard to this larger track?
A. Clearing, road work, some engineering. An auction was held to sell the land.
Q. What was the original plan? Was it to take it all the way through development, the RV park and the things you mentioned, or had it just been to try to get it to entitlement and then sell it off?
A. No, the original plan was to create something, to make it into something, whatever the best use was. The 80 lots were conversations with Jackson County and what they would approve based on slope ordinances and so on and so forth as a density.
Q. You mentioned an auction. Why was there an auction to try to sell the property?
A. At some point, due to the economy, Covid, everything that was going on, we decided that, let's see if we can get some value. And that's why that was done.
Q. And that auction ultimately didn't result in a sale, correct?
A. It did not.
Q. What kind of interest did it generate?
A. We happened to have had the auction on one of

Page 40

the worst winter storms. And so we had very poor visibility, very poor attendance.
Q. Regarding the loans for the smaller lots, the loan for the bigger lot, is it fair to say all the money received by my client has been spent in the some form or fashion?
A. It has.
Q. Okay. And how would I determine what that money was spent on? What kind of records would I need to look at?
A. We would have our accounting records and bills that were paid.
Q. And who was in charge for entering those bills and operating that accounting system?
A. That would be Beth.
MR. DURHAM: Okay. And I didn't get the connection. Spouses?
MR. MCCALL: (Nodding head up and down)
MR. DURHAM: Okay. All right.
Q. Is that your understanding? Beth, they're married?
A. Yes.
Q. Were there other investors for either of these? If I call them two projects, is that fair?
A. That's fair.

Page 41

Q. Okay. Were there other investors on the two projects?
A. On the big lands, there was another investor.
Q. And was that Mr. Fernandez?
A. Correct.
Q. How did you all get connected with Mr. Fernandez?
A. Mr. Fernandez and I worked on the Mountain Meadows project -- I mean the Valle Verde project in Woodfin.
Q. And how much did he invest in -- you said Mountain Meadows for a second. Is that what this larger track was to be called?
A. Yes.
Q. How much did he invest in Mountain Meadows?
A. 400,000.
Q. And he's currently still owed that 400,000?
A. He is.
Q. Do you know if he's owed interest?
A. No.
Q. Do you know what -- I've seen a deed of trust given for the larger track in favor of Mr. Fernandez. Do you know if there was a promissory note as well?
A. No.
Q. Do you know what kind of loan agreement there

Page 42

be might have been with Mr. Fernandez?
A. Just the note.
Q. And where do things stand with Mr. Fernandez in that loan now?
A. They've called in the note.
Q. I understand that was supposed to have been a foreclosure hearing two days ago, but that got continued. Do you know why that got continued?
A. I do not know.
Q. Are you aware of any proposals Wolf Lake has made to Mr. Fernandez to try to resolve this debt?
A. I am.
Q. And have any of those proposals been accepted?
A. No.
Q. What are the terms of those proposals?
A. The same as Olga; land in exchange for.
Q. Land in exchange for some kind of relief on the debt?
A. Correct.
Q. Okay. Now, when I hear that answer, I understand that to mean actually offering to convey the land as part of some sort of relief on the debt. Is that what you meant?
A. Some parcels of the land value to the value of what was lent?

Page 43

Q. Okay. What -- and you said those proposals or similar proposals have been made to Olga?
A. Well, on the guarantee with Olga, we guaranteed 10 lots.
Q. So 10, you would convey ten lots of this larger track to Olga for relief from the debt on this Mountain Meadows project?
A. Correct.
Q. Has that been relayed to her, do you know?
A. I do not know.
Q. Okay. And how many lots total would you get out of Mountain Meadows? It's like 80 --
A. About 80 lots.
Q. Okay. And so you think 10 to Olga would be fair exchange for the half million dollars on Mountain Meadows?
A. We had a recent CMA done that came in at 38.9 thousand an acre. And so we would make the offer fair to the amount of money that was lent and the interest that is owed.
Q. How many acres is the Mountain Meadows? Hundred and --
A. 16, I think, total.
Q. And you made then some similar calculation with regard to Mr. Fernandez?

Page 44

A. Correct.
Q. And has he rejected, accepted, considering it? Where does that stand?
A. I don't know. The offer was made. He had requested that kind of agreement between us. And so that the offer was sent to him. I don't know what he and his attorney are mulling over right now.
Q. Do you know how many lots was part of that proposal to him?
A. I believe it was 15.
Q. And do you know was it 15 specific lots or just like 15 conceptual?
A. Just 15 conceptual.
Q. Do you have in mind, though, which 15 it would be or general area looking at the attachment A on Exhibit Number 5?
A. Somewhere toward the middle of the property going up.
Q. Okay. And then what about anything you have in mind for Olga?
A. For Olga would be on the lower end. And there's a value there because there's less cost to develop, to bring power and less road work.
Q. So there has been -- on this Attachment A, I see some potential roads, cul de sacs and things. None

Page 45

of that's been paved, correct?
A. No, not paved.
Q. Have those paths been cleared?
A. Yes.
Q. Okay, so if you were to go out there, you could get a general sense of where the roads would be?
A. Correct.
Q. Okay. Have all the lots been cleared?
A. Toward the bottom, lots 9, 10, 11, 12 have some clearing, but not extensive.
Q. And the vast majority then of Mountain Meadows has not been cleared?
A. The vast majority has been cleared.
Q. Oh, okay. Has been cleared then. Where's the access to that development?
A. All the way to the right, off 281, you'll see the blue line.
Q. Okay. And then enters in by that lot 1 then, I guess?
A. Yep.
Q. Okay, what about any proposal for the smaller lots, the 1, 3B, 2 as well? Have you made any proposal to Olga for those?
A. We have not.
Q. Do you have any similar thing in mind? Would

Page 46

you convey those to get relief from the debt?
A. We would.
Q. What do you think? You mentioned the CMA that you got on the larger tract. Do you have any understanding of the value on 3B, 1 and 2?
A. Lot 2 has a home on it. It's been cleared. It's not raw land. And so just the value of the lots would be 100,000 an acre. And so I wouldn't know. We need to dig in there.
Q. The home is not fully complete, correct?
A. Correct.
Q. Okay. What needs to be, left to be done on that?
A. Some finish work on the home, and then HVAC, septic and well.
Q. You have an idea on what the cost of that will be?
A. Based on the estimate by our GC, between 200 to 250,000.
Q. And you know how much Wolf Lake has spent already for the development of lot 2?
A. I do not because lot 1 and lot 2 were developed and graded and cleared and all of that at the same time.
Q. Do you know in the accounting system if all that was just sort of treated jointly, lot 1 and 2

Page 47

expenditures?
A. No, I think we separated them.
Q. Do you know who Attorney Ken Davies is? Does that name ring a bell at all?
A. No.
Q. Okay. The reason I ask is that Ken Davies, at some point, and it's attached to the Complaint, actually recorded those Guarantee Agreements on record with Jackson County Register of Deeds, signed an affidavit and filed them. I didn't know if you knew kind of what that was all about.
A. I don't.
Q. Let's look at another one. Good to keep going. You want to take a break?
A. Yeah. Yeah. I've got a, battling a cold.
Q. Okay. We'll go off the record for a few minutes.
(RECESS TAKEN FROM 10:17 A.M. TO 10:29 A.M.)
BY MR. DURHAM:
Q. All right, Mr. Lopez, I'm going to show you what I'm marking as Exhibit 7.
(EXHIBIT NUMBER 7 WAS MARKED FOR IDENTIFICATION)
Q. Do you recognize Exhibit 7?
A. I do.
Q. Is that your signature under the recipient?

Page 48

A. It is.
Q. And is that Mr. McCall's under Guarantor or Guarantee?
A. It is.
Q. And as I understand, this is basically just a simple investment agreement with Olga?
A. Correct.
Q. Okay. Just representing that there will be $500,000 loaned. Do you see that?
A. I do.
Q. Okay. Is this for the, what I would call the first project, the 1 and 3B, as best you can tell given - -
A. Based on the date, yes.
Q. Yeah. And it references that it's pursuant to a subscription agreement. Do you see that?
A. I see that, yes.
Q. Are you -- do you know of a document actually called Subscription Agreement?
A. I do not know.
Q. Do you know of any agreements, written agreements with my client, beyond this Investment Agreement and the two Guarantee Agreements we looked at?
A. No.
Q. Where does Wolf Lake have its bank accounts?

Page 49

Is that First Bank?
A. I don't know.
Q. Beth obviously would know that?
A. Correct.
Q. Let me go through. There have been various emails to my client from David and Manny and I think you as well, during the course of these two projects. And I want to go through a number of those. I'm going to fly through some exhibits here.
A. Show you what I've marked as Exhibit Number 8.
(EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION)
Q. Appears to be an email from David Lane dated January, is that January 25th, 2022?
A. Yes.
Q. What was David Lane's involvement in these projects after Just sort of putting you all in touch with Olga?
A. Just as the person that knew Olga. Just someone that communicated with us occasionally and then spoke back to her.
Q. As I understand, his email on January 25, 2022, basically says, Hey, Olga, I spoke with a developer. They told me they were expecting to close in April and pay the principal and full interest of the first project. Is that how you read it?

Page 50

A. Correct.
Q. Okay. That obviously didn't happen?
A. Correct.
Q. Okay. Had you or anybody at Wolf Lake communicated to Mr. Lane that you all were expecting to close the first project in April of 2022?
A. No.
Q. Do you know where he got that information from?
A. I do not. Through the process, we had multiple people that were interested in making an offer on the land. It never happened. I don't know if one of those conversations is where he got that information from.
Q. Do you know what the status of the build was on the first project in January of 2022?
A. I do not know.
Q. You know when the modular home was actually delivered by Cardinal to lot 2?
A. I don't know exactly.
Q. Was it before the hurricane? After the hurricane?
A. That was before the hurricane.
Q. David says the second project scheduled to be completed in July and your investment and interest will be returned at that time. Is that what it says or how

Page 51

you read it?
A. Yeah.
Q. That obviously was not the case.
A. No.
Q. You know where he got that information?
A. Absolutely not.
Q. Would that have been a fair expectation in January of 2022 that they the second project would be completed in July?
A. No.
Q. Do you know where you got that information?
A. No.
Q. Showing you what I've marked as Exhibit Number 9.
(EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION)
Q. Is Exhibit Number 9 an email from you?
A. It is.
Q. On January 5th of 2022?
A. Correct.
Q. Okay. So a little bit, what, 20 days before that email we just looked at?
A. Correct.
Q. And you're emailing Olga in Exhibit Number 9?
A. Correct.
Q. Okay. Now you say -- as I understand it, after

Page 52

wishing her Merry Christmas and Happy New Year, correct?
A. Correct.
Q. You say, I wanted to let you know we've not had any communication with David recently for various reasons. Is that how you read it?
A. Correct.
Q. Okay. Why had you not had any communication with David for various reasons?
A. Manny had the relationship with David. I have no idea why we were no longer talking, speaking with David. That's why I wrote the email myself.
Q. But you also say, But it has nothing to do with our business or our agreement with you. Do you see that?
A. Correct.
Q. Why did you say that?
A. Because David and her were friends. And so, you know, I'm talking to you; I'm not talking to David.
Q. I'm just trying to understand why, you know, David was involved. He sent some emails. Why would you not -- did somebody break off communication with David? Let me ask you a different way.
Was there any kind of problem or issue with David that stopped the communications with him?
A. That would be a question for Manny because he

Page 53

had the relationship with David. I really didn't know the man.
Q. So, as you're testifying here today for Wolf Lake, though, you're not aware of what the cause was for stopping communications with David?
A. Correct.
Q. But then, as we just saw in the Exhibit 8, David emailed Olga 20 days later with some project updates, correct?
A. Correct.
Q. Would you have expected him to do that if y'all weren't communicating with him?
A. No.
Q. Do you know why he did that?
A. I have no idea.
Q. Were you aware he had done that?
A. No.
Q. You go on to say that although Covid has caused some delays, everything is on track, just like our deal with you. You see that?
A. Correct.
Q. Okay. And you expect the shipment of the first house this February. So that'd be February of '22?
A. Correct.
Q. And will that be the home that went to lot 2?

Page 54

A. Correct.
Q. Was that home shipped in February?
A. I'm not sure.
Q. You also say we have several buyers who are ready to see the house, and we hope to have the house ready for delivery this March or April at the latest.
A. Correct.
Q. And that ready for delivery, would that be delivery to the buyer?
A. (No response)
Q. I'm just trying to understand.
A. No.
Q. You say we expect shipment in February and then ready for delivery in March or April. It can't be the same delivery, could it?
A. No.
Q. So what would that delivery in March or April be?
A. It might have been for the following year. We would not complete the home in that short a time.
Q. Okay, so but you didn't say March or April of the following year?
A. No.
Q. But that would be the rough timeline? If it delivered in March, it would be -- it would take that

Page 55

long to do HVAC and roof and all the things you mentioned earlier?
A. Correct.
Q. Says the second house is in production and the land is ready for delivery in April. What is that talking about?
A. We had spoken with Cardinal about a second home for lot 1. No payment was made on that. We stopped payment on that home. And so it was never put into the pipeline.
Q. Do you know if production had ever even started on that second home?
A. They had a couple of homes that were. That we can choose if we wanted to. And we had looked at one of the homes.
Q. And so why did that process stop?
A. Trying to find labor, work, the cost of materials at the time. It just wasn't the right time.
Q. Do you know how long after this email you made that decision?
A. I don't know.
Q. Do you know if you communicated with Olga that you had put a stop to that production of the second house? A. At some form -- at some point in one of our conversations, one of our calls, we had focused, we

Page 56

were focusing on delivering that one home.
Q. And then you say, We're confident we'll be able to sell and close both houses quickly and pay what is due with interest that this spring. Am I reading that right?
A. Correct.
Q. So that's different from what you just told me though, that it would take 12 months at least once the home is delivered to get it ready for sale.
A. Correct.
Q. So why did you say be able to sell and close both houses quickly and pay what is due with interest this spring?
A. I don't recall.
Q. You would agree that that's unrealistically optimistic, correct?
A. Correct.
Q. It says the other project with 80 lots is underway and we hope to have the sale of the lots in June of this year. Do you see that?
A. I do.
Q. Okay. And so what did you mean by the project with 80 lots is underway?
A. We had contracted a (phone ringing).
Q. Sorry. And if you need to take a break to deal

Page 57

with that.
A. No, no. We had contacted and we were in communication with a company that would hold one-day events, weekend events.
Q. What does that mean? Like not open houses, since there are no houses, but sort of showing off the area for sale?
A. Yeah. What they would do is we would have an event where they would market and bring people into the community, do a weekend thing, and then sell off the lots individually.
Q. It says we are confident we can settle that other investment with interest by July or August at the latest. Do you see that?
A. Yes.
Q. Okay. And was that, was that a realistic expectation in January of 2022?
A. There were multiple conversations about how we would make Olga whole, including selling the lots, selling the home as they were, doing events. We never stopped trying to generate income and pay the debt.
Q. And none of the lots out of the Mountain Meadows project have been sold?
A. Correct.
Q. I'm handing you Exhibit Number 10.

Page 58

(EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION)
Q. This is an email from -- it's from David Lane, dated January 15, 2023. But it looks like it might have been typed up by you --
A. Correct.
Q. -- because it's got your name at the bottom.
A. Uh-huh. Yep.
Q. Okay. So did you type the text in this Exhibit 10?
A. I did.
Q. Okay. And did you send that to David for him to forward to Olga?
A. I think so.
Q. Okay. We looked at an exhibit earlier where you weren't having any communications with David anymore for various reasons. Now, a year later, you're sending him an update for him to forward. Do you know what happened that recommenced?
A. It might have been Olga requesting that we communicate with David because of language. I don't recall.
Q. Okay. It's got a Carlos on the email recipient list as well. Do you know who that is?
A. That's Olga's son.
Q. Did you have any phone conversations with Carlos during these projects?
A. Right around after this email, we had a couple of -- he got involved. Prior, I don't think we did.
Q. And I just want to walk through this text on Exhibit 10. You attach a picture. And is the picture of what was -- would be the home on lot 2?
A. That's the foundation. Yes.
Q. Okay. All right. You give sort of an update. You say, "The engineered home from Cardinal Homes has been completed and paid for." Do you see that?
A. Correct.
Q. Okay. So here we are, January of 2023. And then what we looked at earlier was January of 2022. You said you were hoping that the home would be delivered in February of 2022. Home still hadn't been delivered by February of '23, correct?
A. Correct.
Q. Okay. Do you know why, what happened there?
A. Production issues with Cardinal was one of the issues. Completing the work on our end. You recall during this time what was going on with labor and work, and --
Q. Who at Wolf Lake was in charge of dealing with Cardinal on the production issues?
A. The GC, MJ Mountain Builders.

Page 59

Page 60

Q. Was there a particular person at MJ Mountain Builders that was in charge?
A. Yes.
Q. Who was that?
A. Monte Wallace.
Q. Is he still at MJ, do you know?
A. I don't know.
Q. When was the last time you talked with Monte?
A. A year and a half ago.
Q. Is their work all done on the house?
A. Yes.
Q. Okay, so the remaining items that you mentioned, Wolf Lake would be in charge of arranging for that directly?
A. Correct.
Q. Okay. You mentioned the pending issue is delivery of the home, we've paid for the delivery, have engaged the crane contractor and are waiting for the Jade operator. What is the Jade operator?
A. Because of the site, a crane could not get all the way up to lot number 2. And so it's a smaller piece of equipment that can bring the home up. We waited months to be able to finally get someone that can do the work.
Q. You talk about, "The ongoing issue is that he is employed by Schumacher Homes and can only get to our project when not working for Schumacher."
So is he sort of running that independently?
A. Yes.
Q. Okay. How would we find out when that project was actually -- when that home was actually delivered?
A. We have documentation.
Q. And you say Dona Olga's or "Olga's investment is secured with the land, completed and paid for home, site work and engineering." Do you see that?
A. Yep.
Q. Okay. And is that what we talked about, that lot 2 was to be included as collateral for loan?
A. It was.
Q. Okay. "The market in our area is showing no sign of slowing." Was that your understanding in January of 2023?
A. Yeah. For Mountain homes on lakes, anything that was worth buying was purchased quickly.
Q. How does that market stand now?
A. Market's have changed a little bit.
Q. How so? Just, has it cooled? Are they looking for something different or --
A. I don't think it's cooled. I think that mountain property that's new construction with direct

Page 61

access to a Lake that's 22 miles from Toxaway is something that's still very, very attractive. (Phone ringing) Pardon me one second. I apologize. Can I take this?
Q. Sure. We can go off the record.
(RECESS TAKEN, 10:51 A.M. TO 10:56 A.M.)
BY MR. DURHAM:
Q. You mentioned a couple times in these documents and in your testimony about Covid. Did Wolf Lake take out a PPP loan at all?
A. No.
Q. Okay.
MR. DURHAM: Can you give me number 14?
Q. Marking Exhibit Number 11 for you.
(EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION)
Q. This is an email from David to Carlos and Olga, January 15th of 2023. Do you see that?
A. Yeah.
Q. And it attaches a document about the auction. Is that the auction you referenced earlier?
A. It is.
Q. It turned out to be the terrible weather?
A. Correct.
Q. Had you dealt with this International Auction, LLC before?



A. No, they were just highly recommended.
Q. Do you know who recommended them?
A. I don't recall.
Q. Okay. It says in the email from David "in an attempt to sell the 75 acres." That's not all of the larger track, is it?
A. No, it was the cleared, more ready for develop tract that would allow the 80 lots.
Q. Says there were "no real bids that went beyond verbal." And "The verbal offer has not materialized. Into a written offer." Do you know what the verbal offer was?
A. I don't recall.
Q. Says "The prospect, Mr. Langly." Do you know what Mr. Langly's first name is?
A. I do not. That was according to the, the auction company.
Q. Okay.
A. It might have been true or not. I don't know.
Q. Okay. So you never met Mr. Langly?
A. No.
Q. Never had any direct communication with him?
A. No.
Q. Or his supposed CEO, Scott Epperson?
A. No.



Q. Okay. Have you -- has there been any more contact through the auction company from Mr. Langly or Mr. Epperson?
A. No.
Q. It says "We were expecting a visit from Leland" Strickland. Or Stickland. Who is that?
A. Just a developer that someone knew that said he would be interested in looking at the land.
Q. Did he come look at it?
A. He did not.
Q. Do you know why he did not?
A. Don't know.
Q. And it says also a visit from a Savannah, Georgia developer who is interested. Do you know who that is?
A. Do not.
Q. Do you know if they ever came?
A. No.
Q. Says "We are in the process of scheduling a meeting with an event company, Wood & Water Realty, LLC and Transcendent Marketing & Development, LLC." Is that two companies or is that one company?
A. It's two companies, but it's one group. And that's to do the event sales over the weekend, kind of.
Q. When was the last time they did any event sales



out there?
A. I wouldn't know.
Q. Is there any active marketing of the Mountain Meadows project?
A. Not at this time.
Q. Says you're just -- that "they are interested in purchasing the land outright." Do you know who the "they" is?
A. Yeah, that's the Woods & Water Realty, LLC.
Q. Okay. "Or a possible JV." Is that joint venture?
A. Correct.
Q. "I hope to have a call scheduled with Jason Benton and his CEO Trent for this week." Are they with that Woods & Water group?
A. Correct.
Q. And is it you that has communication with that group or is it David?
A. It was me.
Q. Okay. Says "Additionally, we have engaged a marketing company who will send a proposal." Do you know who that marketing company is?
A. Yes. Give me a second. They're out of Miami. They did some work with me in the past, and so I wanted to see what they can do and what the cost would be to get

Page 66

more eyes on the property.
Q. And were they engaged?
A. No. No. We didn't believe that they would add any value.
Q. And so there are no current brokers engaged --
A. Not at this time.
Q. Do you know when the last one was?
A. I believe it expired, I want to say late last year.
Q. Do you know who that was with?
A. It was with Sotheby.
Q. And then David says, (as read) As with everything that we're doing, it's our intent to fully pay off all of our debts, plus the interest earned.
Do you see that?
A. Correct.
Q. Okay. That is Wolf Lake's intent?
A. Yes.
Q. Okay. I'm going to mark Exhibit 12.
(EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION)
Q. Down at the bottom of Exhibit 12, there's an email from you to David, February 27, 2023. Is that correct?
A. Correct.
Q. And you're attaching a balance sheet for all

Page 67

three lots at Wolf. That's the Wolf Lake project?
A. Right.
Q. It says, "I've included the parcel information showing that Wolf Lake Development, LLC is the owner and that there are no liens on the land." Do you see that?
A. Correct.
Q. Okay. Says "This info was requested by Olga." How did she request or do you know why she requested that information?
A. She wanted to see, I believe, what was spent. And so that's what that's about.
Q. At the end of this email, it says, "I have the receipts for lots 1 and 2 that I will bring with me to Florida."
What Florida trip is being contemplated there?
A. I go to Florida regularly to visit my parents, so it would have been one of those.
Q. Were you contemplating, though, giving those to David or Manny or somehow getting those to Olga? I'm just curious about the, hey, I'll bring receipts with me on this trip.
A. Yeah, we -- it was something like that. Correct.
Q. Okay. But do you know if those receipts were actually provided to Olga somehow?

Page 68

A. They were. Yeah.
Q. Do you know who sent those?
A. I do not.
Q. Do you know if you sent them or Beth?
A. I didn't.
Q. It does say back up in that first paragraph in your email that there are no liens on the land. Do you see that?
A. That's for lots 1, 2 and 3B.
Q. Because there was the lien on the larger track for Mr. Fernandez?
A. Correct.
Q. Do you know who Valley Song Redevelopment is? You ever heard that name?
A. No.
Q. Are you aware there is a lien on some portion or there was on 1 and 3B in favor of Valley Song?
A. No.
Q. Okay, but you don't say there are no liens on the 1 and 3B. You just say the land. Correct?
A. I didn't specify if it was 1 and 3B.
Q. Okay, but you're talking about all of, all the lots in this email, correct? 1 and 2, 3B and the large tract, correct?
A. I don't recall.

Page 69

Q. Well, it says, please find a balance sheet for all three lots at Wolf. You see that?
A. Correct.
Q. Okay. And then it says "The first parcel is actually 1 and two combined." Do you see that?
A. Correct.
Q. So I'm sort of counting that as number one.
A. Correct.
Q. And then the second parcel is 3B. So that's two.
A. Right.
Q. And then the last is for the large tract.
A. Correct.
Q. Which would be the "three lots at Wolf" that you referenced?
A. Correct.
Q. Okay. And then does Olga at the -- it looks like David forwards this information to Olga and then Olga responds at the top to Dave, correct?
A. Correct.
Q. And does she sort of take issue with this balance sheet in some regard?
A. Correct.
Q. Okay. She thinks maybe there should be some more to it. Is that fair?

Page 70

A. Correct.
Q. Okay. And then let's look at the attachments. There's the lot 2 parcel is the first one?
A. Yes.
Q. And that's where the home was actually built?
A. Correct.
Q. And then there's lot 3B right after that.
A. Yes.
Q. Nothing's been done on -- remind me what's been done on 3B.
A. Clearing.
Q. Okay. And then the next one is some portion of the larger tract. Is that right?
A. No, that's -- I believe that's 3B.
Q. 3B is the, 3B's got the road frontage, that little, I'll call it a belly for a highly technical term, right?
So let's go back to the first, the first aerial. Let's just start from there. You see that says Lot 2 down to the bottom left.
A. Yeah.
Q. And the very next one is 3B, which has that road curvature.
A. Okay.
Q. The next one, it says PT TR B. And I don't

Page 71

know what that stands for. But the large tract butts up against 3B, correct?
A. It does.
Q. Okay. I think this is part of the larger tract. But if you're not able to say that's fine.
A. Yeah, I don't -- it possibly is.
Q. Okay, let's go to the balance sheet that's after that. And it says checking/savings at First Bank. Does that refresh your recollection at all about where the bank accounts are?
A. Yes.
Q. Okay. Does it, best of your recollection, it is First Bank?
A. It is.
Q. And then it breaks things out to assets by the lot 3B, the Mountain Meadows, the lot 2, and the lot 1. Do you see that?
A. Yeah.
Q. Okay, on the next page, on the Liabilities & Equity section, I want to ask about those. There's a Beth loan of $3,000. Do you see that?
A. Yeah.
Q. Okay. And is that ONeal's wife that was in here earlier?
A. Correct.

Page 72

Q. Okay. Do you know if that loan is still outstanding?
A. I don't know.
Q. Do you know when that loan was made?
A. I don't.
Q. Do you know if any collateral was given for that loan?
A. It was not.
Q. And then the Jaime loan of $162,000. $162,190, Do you see that?
A. Correct.
Q. Okay. And is that a loan you made?
A. Correct.
Q. What was the original amount of that loan?
A. I don't understand.
Q. Yeah. Was that the actual loan amount? Like, sometimes this is a balance. Like it might have been higher, and this is what's left.
A. No, that was just money that I put in.
Q. Okay, you put in that 162,000 figure?
A. Correct.
Q. Okay. Was there any collateral that --
A. No, there was not.
Q. Okay. Is that documented in a promissory note somehow?

Page 73

A. No, it was just money that I wrote checks for to try to complete the project.
Q. Do you know if you wrote those after the three loan dates that we looked at earlier?
A. Yes.
Q. Okay, so you had. Had all the money from my client before you made those?
A. Correct.
Q. What about Beth was hers a higher amount or did she put in $3,000?
A. I don't recall. Any amounts that were put in, were put in after Olga and they were all personal investments to complete the project.
Q. And then the ONeal loan, do you see that? Is that -- that's an oddly specific number to loan, $97,736.81. Do you know if that was the actual loan amount?
A. I don't.
Q. Do you know if the Beth loan, the Jaime loan, and the ONeal loan are still owed by Wolf Lake?
A. That's money that we personally put into the deal. You know it is in order to complete the project. Whether we get that money out or not, that's on us.
Q. Okay, but you hadn't been, Wolf Lake hadn't been paying those down?

Page 74

A. No.
Q. It's waiting on the projects to sell?
A. Yeah. Yeah. That's the completion of the project or whatever happens.
Q. Okay. There's an investor loan number 2 of half a million dollars. Is that -- who is that?
A. That was -- that would have been Juan Fernandez, but it only got to 400,000.
Q. Okay.
A. The agreement with Juan Fernandez was a half a million dollars.
Q. Okay. But he only ever put in 400,000?
A. Correct.
Q. Okay. And then investor loan of $530,000. Who is that?
A. I don't recall. We -- I think that for the event, for the auction. I think we borrowed $30,000. And so that's, that's what that is.
Q. But you know, where the -- is my client on here that you see?
A. It would be under one of the 500,000s that I can recall.
Q. Well, you thought maybe the loan number 2 was Juan.
A. It might have been miswritten, but it was --

Page 75

yeah, it was 400,000 for Juan and what we ended up actually borrowing, even though the terms were going to be for 500,000. And then we -- one of Manny's friends, put up the money to have the auction.
Q. Is it possible that that 30,000 was then combined with my client's 500,000 --
A. Might have been.
Q. -- and that's what the investor loan there is?
A. Correct.
Q. It says Investor loan number 4 is 300,000. Do you know who that is?
A. I don't.
Q. My client for lots 1, 2, 3B and Mountain Meadows loaned a million dollars, correct?
A. Correct.
Q. Okay. Do you see that million dollars reflected on this balance sheet in Exhibit 12?
A. The problem is that these were combined. Again, I didn't prepare this, so I'm trying to recall, but this is all three investors for both projects.
Q. And did Beth prepare these?
A. I don't know.
Q. Did you, when Olga said she had took issue with these as balance sheets, did you hear anything about that dispute or follow up or where that might have gone, if

Page 76

anywhere?
A. No. After that email, we had conversations with Olga after as she saw that we were trying to keep working and trying to make this happen.
Q. Did you ever tell Olga about the Juan Fernandez loan?
A. Me personally? I don't recall. But early on in the process she would have known about it.
Q. How would she have known about it?
A. In conversation.
Q. With who? With you?
A. Maybe. Or maybe with David Lane at the time, since he was the liaison.
Q. Okay, well, your email that we were looking at talking about all three lots, both projects, says there's no liens on the land. It doesn't say, except for the Juan Fernandez loan, which you know about, correct?
A. Correct.
Q. I mean, I'll represent to you that she was surprised when I told her about this Juan Fernandez loan being a deed of trust on the property.
A. She shouldn't have been. Early on in the very process of closing the land, she was informed, that that's how we were buying the property.
Q. Okay, but you don't know who informed her that?

Page 77

A. I do not know.
Q. Did you use some of her funds to actually acquire the property?
A. We used her funds and Juan Fernandez's fund to acquire the large tract of land. Yes.
Q. Do you know who you bought that from?
THE WITNESS: ONeal?
A. I don't. I don't know the entity.
Q. Does the name Lacy Investment Corporation ring a bell?
A. I think it does, yes.
Q. Do you know, does that ring a bell as to the possible seller on the larger tract?
A. Correct.
Q. Okay, I'll come back to that one later. I'm trying to put my hands on another balance sheet. Showing you what I've marked as Exhibit 13.
(EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION)
Q. This is an email from you to Olga, October 10 of 2024. Do you see that?
A. Yep.
Q. Okay. And this is after the hurricane. It looks like you're giving her an update about that.
A. Correct.
Q. You attach another balance sheet for lot 3B,

Page 78

the 75 acres, lot 1 and lot 2 at the house. Do you see that?
A. Yeah.
Q. So the four parcels we just looked at previously. You say "On lots 3B, 1 and 2, with the house $147,426.44 above your initial 500,000 has been invested into these lots." Do you know where that figure comes from?
A. It was what ONeal and I put into the deal.
Q. And do you know what the total -- so was the total spend on that 647,426?
A. I don't know.
Q. If you look at the last page of the balance sheet as of -- so we've got -- this is as of December 31, 2023. Do you see that?
A. Yes.
Q. And the one we looked at previously was as of February 28, 2023. So roughly 10 months later, you've got -- I see the Beth loan on there and the same amount that we looked at.
A. Yeah.
Q. I see the Jaime loan and the, it's changed a little bit, but not enough to worry about. It's got the ONeal loan. That's gone to $160,367.56, which is up from the $97,000 figure. So did he put additional money in?

Page 79

A. That's my understanding, yes.
Q. Okay. And then there's an investor loan 5, which was not on the previous balance sheet.
A. That was that 30,000 that I mentioned for the, for the auction.
Q. Okay. So that 530 number we looked at earlier then probably would not have been, not have included that?
A. Correct.
Q. Okay. All right. And then we've got investor loan. We still have that 530 that we're not. Could that be my folks plus some interest or --
A. I don't know. Maybe.
Q. And then maybe the Juan Fernandez loan, even though that was 400,000.
A. Correct.
Q. And then the 300,000, we're not sure who that is? Or do you know?
A. No.
Q. Where would we go to find out who these people are?
A. We have documentation.
Q. An investor loan, 40,000. I'm not sure if I asked you that. Do you know who that is?
A. No.

Page 80

Q. Okay. All right. Again, you did not prepare this, correct?
A. Correct.
Q. And do you know who did?
A. I don't.
Q. Showing you what I've marked as Exhibit 14.
(EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)
Q. I asked you earlier about Valley Song Redevelopment. I'll represent, this is a deed of trust that ONeal Land Company took out in favor of Valley Song Redevelopment on January 18th of 2019. Do you know, have you seen this Exhibit 14 before?
A. I have not.
Q. If you could flip through the very last -- actually look on that first page. Do you see that it says grand tour being ONeal Land Company is indebted to Valley Song in the amount of $220,000?
A. I do.
Q. Then if you could flip to the last page. There are three tracts of land covered, one being lot 22, which I asked you about earlier.
A. Correct.
Q. One being lot 3B, which is one of the properties that was to be developed.
A. Correct.

Page 81

Q. And then Lot 1, which is also one of the properties to be developed.
A. Correct.
Q. And this was recorded again January 18, 2019, which was before my client's loan. Correct?
A. Correct.
Q. Do you have any understanding of what this loan with Valley Song is about and why these three tracts were originally encumbered as part of that loan?
A. I do not.
Q. Do you know anything about Mr. McCall having a prior bankruptcy at all?
A. No.
Q. Has he ever told you that he ever filed bankruptcy before?
A. No.
Q. Let's go to -- I'm marking Exhibit Number 15 and handing it to you.
(EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION)
Q. Exhibit 15 is a Partial Release recorded September 29th of 2021. That is after the loan from my client to Wolf Lake?
A. Correct.
Q. Okay. And it appears to release from that Valley Song lien that we just looked at. It at least

Page 82

releases lot 3B. Do you see that?
A. I do.
Q. Were you -- did you have any knowledge of this transaction at all before you came here today?
A. Not that I can recall.
Q. Do you know if lot 1 was ever released from the Valley Song lien?
A. I don't know.
Q. Okay. And again, just to be clear, had you ever heard a Valley Song before today?
A. No.
Q. Handing you what I'm marking as Exhibit 16, which is a warranty deed from ONeal to Wolf Lake, dated - - recorded November 4, 2021. Do you see that?
(EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION)
A. I do.
Q. Okay. And that again is after the loans by my client to Wolf Lake, correct?
A. Correct.
Q. And it's two months, or about a month and a half after the Exhibit 15 we looked at. So in other words, in the Partial Release document, Valley Song releases lot 3B from their lien. And then in November following that, ONeal conveys lot 3B to Wolf Lake. Does that appear to be the case? And you can look through

Page 83

that, make sure the property description at the end is that 3B?
A. Yes.
Q. Do you have any understanding of why this transaction occurred?
A. I mean, why it occurred? Yeah, but not, not knowledge of it.
Q. Okay. Because, you know, I represented a little bit ago that my client was surprised when she found out about the Juan Fernandez lien. She's equally surprised that at the time of the loans, Wolf Lake didn't own 3B. It was technically subject to a lien in favor of Valley Song. And then Valley Song released it, and then it was ultimately conveyed to Wolf Lake in November of 2021. Any explanation given for any of that while that sequence of events occurred after the loan?
A. No.
Q. And then if you could go back. Sorry to make you juggle some paper here. If you can go back to Exhibit 3, early in the stack. That's the document from Manny that lists the payment receipt dates with a red Wolf Lake letterhead at the top, one page document.
So on October 30th of 2021, Manny tells Olga in that very last paragraph, says, I will send you information from Jackson County which shows that the land

Page 84

is free of -- and I think that's what you said you were, had a hard time with that word?
A. I've never heard that word.
Q. Okay. If that was a representation that the property was free of liens, you'd agree, based on what we've looked at, that at least lot 1 and the larger tract were still subject to liens as of October 30, 2021?
A. Correct.
Q. Okay. I'm marking Exhibit Number 17, which I believe is the cover email that goes with that Exhibit 3.
(EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION)
Q. Can you translate David's email from the "Good morning, Ms. Olga"?
A. I am -- hope that everything is going well with construction.
I'm imagining that's her own construction.
The initial letter, I am waiting for a letter from the city that shows that the lots are, has no, whatever the word encumberments or liens or whatever. I don't know what that word means.
Q. Okay. So do you understand this to be a representation from him that he's gonna get a letter showing that the land is free of any liens?
A. Correct.
Q. Okay. Which again, we know that at least the

Page 85

larger tract and lot 1 in favor of Valley Song did have some liens on them based on what we've looked at?
A. Correct.
Q. Okay. Did you have any conversations with David about whether or not these properties had liens on them? To your knowledge -- let me ask it a different way.
To your knowledge, did David know about the Juan Fernandez lien? Sorry.
A. I would imagine so.
Q. I said David Fernandez, didn't I?
A. Yeah.
Q. I think I meant Juan Fernandez.
A. I would imagine so because we were -- we're up front.
Q. Okay. But you recall having any specific instance in which --
A. Not a conversation that I can recall.
Q. Okay. Are there any property taxes still outstanding on any of these properties?
A. Not that I know.
Q. Y'all won't find this as fascinating as I do, but my folder 18 actually matches up with Exhibit 18, so --
A. Little victories.

Page 86

Q. You take what you can get.
A. That's right.
Q. Showing you what I've marked as Exhibit 18, which is a email update from Manny to Olga copying you. So I imagine -- do you recall seeing this when Manny sent it?
(EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION)
A. I recall that he sent it. I don't know if I read it, actually.
Q. Okay. And it's dated, the email was sent February 11th of this year.
A. Correct.
Q. And I just want to run through some of the updates. There's a section titled -- actually, the first sort of main paragraph, the good morning paragraph, it talks about the effects of the hurricane. It says, we're working with FEMA to obtain the funds they are offering for hurricane related damages. As soon as we receive the funds, the house will be completed and we will proceed with the sale.
A. Correct.
Q. Okay. Did you get those funds?
A. No.
Q. Okay. What happened with those funds?
A. We began the process and it got bogged down and

Page 87

we just never proceeded.
Q. Would you attribute that to being why the house has not been completed?
A. Correct.
Q. Okay. Mountain Meadows, it says we've listed with two different real estate agents, both with Sotheby's. That's the group you mentioned earlier.
A. Correct? Two different agents with Sotheby's. Different times.
Q. Currently interviewing other agents. Bill Steigherwald with Tessier and Associates.
A. Correct.
Q. Where did those interviews go?
A. We didn't want to list it again. It had produced nothing. So we told Bill, if you have a buyer, after discussions, if you have a buyer, we'll certainly sign an agreement for that particular transaction. But that's as far as it went.
Q. There's a section, Prospects on the Table, and it talks about a lender we have known for a long time. Do you see that?
A. Correct.
Q. Who's that lender?
A. Friend of Manny's, more of a Miami guy. And he decided not to invest in North Carolina.

Page 88

Q. It says we have a broker, well known in Miami who has excellent relationships with the entire developer community. Who is that broker?
A. Again, this is Manny. He knows a ton of brokers in Miami. Trying to remember who this was.
Q. Says, I have an appointment next week with a group that's interested in projects in North Carolina, in the mountains. Do you know who that group was and what that meeting appointment was?
A. No. We've had countless meetings and appointments and conversations and trying to move forward.
Q. And then it says, Finally we have a developer who just completed a small house development. Do you know who that is?
A. I'm trying to recall their name, but I do know they build tiny homes down in South Florida. Stalo Homes.
Q. How do you spell that?
A. S-t-a-l-o Homes.
Q. Have things gone anywhere with them?
A. No, no, we couldn't get the price, the cost of the homes down to make sense.
Q. Is it, I mean, how would you characterize the activity on the lot 2 house and the Mountain Meadows

Page 89

project? Would you say it's dead or slight heartbeat? Where would you put it?
A. No, we're constantly in communication. We're talking to multiple groups now to see if we can figure it out. We have not stopped the entire time in trying to move this forward. Interest and commitment are two different words.
Q. Is there anything that appears promising?
A. We do (sic).
Q. And what are the details on that?
A. Just an investor group that helped develop Banner Elk along with a gentleman in Miami that Manny knows very, very well. They both know North Carolina.
Q. And where in the life cycle of interest to closing are each of those?
A. We are having a meeting on the, I believe it's November 7th. That may not be the exact date, but it's the first week of November, with all of us down in South Florida to see if we can put pen to paper. And that would be to purchase the entire tract of Mountain Meadows.
Q. If some resolution could be had -- or would you, Wolf Lake, be averse or open to recording an actual deed of trust in favor of Olga like it did for Juan Fernandez?

Page 90

A. I'd speak to my attorney on that, but we would certainly discuss it.
Q. Do you know the name Laura Green? Do you know who that is?
A. I do not.
Q. Do you know the entity Watts Realtors & Auctioneers at all? Does that name ring a bell?
A. No.
Q. You aware of any judgment they had gotten against Mr. McCall up in Kentucky?
A. I'm not.
Q. You aware of any contract that Mr. McCall or ONeal Land Company had ever had to sell lots 3B and lot 1? Actual contracts?
A. No.
Q. Do you know how much lot 22 ultimately sold for?
A. I believe it was $150,000, but I may be mistaken.
Q. Do you know where, how that money was ultimately then spent once it came in?
A. It was spent, that was part of ONeal's investment into the projects.
Q. And has Juan Fernandez been paid at all from his loan?

Page 91

A. No.
Q. Do you know what the interest rate is on his loan?
A. There was no interest originally in the agreement.
Q. Did that change?
A. They're asking for interest now from August of this year.
Q. Do you know why I sense August?
A. (Nodding head up and down)
Q. No?
A. No, I don't.
Q. Sorry. That's a head nod.
A. I do not. I'm sorry.
Q. You mentioned salaries that folks had been paid. Were there any distributions on top of that?
A. No.
Q. When I say distributions, do you know what distributions means?
A. (No audible response)
Q. Just sort of like taking monies out as owners rather than paying yourself salary?
A. No, that was it. That was just the salary.
Q. Okay. That's the -- the salaries were the only monies that you've taken out of first Wolf Lake?

Page 92

A. Personally. Correct.
Q. Okay. Showing you what's marked as Exhibit 19.

(EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION)
Q. We mentioned the Lacy Investment Group. This is a deed from Lacy to Wolf lake, August, recorded August 20, 2021. Do you see that?
A. Yes.
Q. And that appears to be a conveyance of 117.17 acres. You see that on the very last page?
A. I do.
Q. Okay. Is that what we've been referring to as the larger tract?
A. Correct.
Q. Do any of the owners of Wolf Lake have any ownership interest in Lacy Investment Corp?
A. No.
Q. Completely separate group?
A. Correct.
Q. Okay. Have you ever dealt with Lacy Investment Corp before?
A. No.
MR. DURHAM: Let's take about five minutes off the record. I'm at the, towards the end of my outline. I just won't look back through everything.

Page 93

(RECESS TAKEN, 11:46 A.M. TO 11:54 A.M.)
BY MR. DURHAM:
Q. All right, let me go back on Jaime. I appreciate your patience. I've got just a few more documents to ask about I'd forgotten about. But does Wolf Lake have an actual office?
A. No, not a -- the office is out of ONeal's home.

Q. Okay. And you mentioned the salaries that you, ONeal and Manny have been paid. Does Beth receive a salary?
A. No.
Q. Is there anybody else that receives a salary?
A. No.
Q. And when we've made reference to receipts and just some documents that we might all be able to look up, where are those kept? Are there actual paper documents? Receipts?
A. Correct.
Q. Are there electronic documents?
A. Mostly paper documents.
Q. Okay. And who is the keeper of those documents?
A. Beth.
Q. Okay. And those presumably will then all, all

Page 94

be at their house?
A. Correct.
Q. Is there, I didn't even look. Is there an official Wolf Lake email address? Or does everybody use their personal email addresses?
A. Personal email address.
Q. Are there any -- is there just one email address you've used for the Wolf Lake project?
A. Correct.
Q. All right. We talked about 3A, lot 3A earlier. I think that's owned by a couple named the Vaughans maybe. Do you know that name?
A. I don't.
Q. Okay.
THE REPORTER: Did you say Vaughan?
MR. DURHAM: Vaughan. Yeah.
Q. Here is Exhibit 20, an email from Mr. Lane, December 16th of 2020. Do you know if you've ever seen Exhibit 20 before?
(EXHIBIT NUMBER 20 WAS MARKED FOR IDENTIFICATION)
A. No, I have not.
Q. Could I get you to tell me what he's saying in that? What does it say in the cover email?
A. (As read) The agreement is for 500,000, but it could be deposited into two steps. The interest will be

Page 95

paid beginning when each deposit is made, will start. As you can see, the guarantees are the lands and what is constructed on those lands until your investment is canceled.
Q. If you look at the proposed guarantee agreement that's attached, you see, there was a proposal to include lot 22.
A. Correct.
Q. Do you know why that was pulled back?
A. I don't know why it was pulled back.
Q. Here is Exhibit 21.
(EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION)
Q. Is Exhibit 21 a WhatsApp text between you and Olga?
A. Correct.
Q. Appears to be dated November -- there's some November of '23 and then it looks like February and March of 2024 as well.
A. Uh-huh.
Q. You say toward the top, Just a little bit left to finish the metal roof. Waiting on them to start the well and the septic system. We have all the permits and just need the contractor to start the work. Is that what you say?
A. Correct.

Page 96

Q. Okay. And does that work still need to be done? A. The septic is completed.
Q. What about the metal roof? Has that been --
A. Metal roof is completed as well.
Q. Okay. And she asked for pic -- Could you show me the inside of the house? Do you see that?
A. Correct.
Q. Have you ever sent her pictures of the inside of the house?
A. I think so.
Q. Okay. She tells me you haven't. She keeps asking me, get pictures of the inside of the house. I'm like, I'll try. But do you have pictures readily available of the inside of the house?
A. We can take them. Yeah.
Q. And then so she says she makes a couple requests for pictures of the inside of the house. Do you see that?
A. Uh-huh.
Q. Okay.
THE REPORTER: Yes?
A. Correct. Yes.
THE REPORTER: Sorry about that.
Q. Because the only picture that's part of this message thread is from the exterior of the house.

Page 97

A. Correct.
Q. And then fast forward a little bit to February. It looks like you'll have some kind of conversation arranged for 6:00 p.m. Columbia time. Do you see that?
A. (No response)
Q. February 9, 2024 at 3:06 p.m.
A. Correct.
Q. Okay. But then it looks like you needed to reschedule that.
A. It seems so, yes.
Q. Okay. And then February or March, you can read the dates, right? March 9, maybe 2024, it looks like you've got another appointment arranged.
A. Correct.
Q. And then the next to the last, she says, We've been trying to meet for a long time. Please send me photos of the house today. It should have large vegetation, I'm not sure. And all the interior and exterior finishes. Do you see that?
A. What she's saying, yes.
Q. Okay. Do you know if those -- do you know if any of those pictures have been sent?
A. I don't know. Maybe Manny sent them. I don't know.
Q. Okay. She is -- I'll also represent Olga's

Page 98

expressed some frustration that I think appointments were scheduled and then rescheduled or cancelled. And she's just having a hard time getting updates from you all. Is that something that you've heard her express frustration with?
A. No, not really.
Q. Okay, in your mind, has Wolf Lake kept her as updated on this project as she should be?
A. When any new information became available, we reached out to her. Any progress, we reached out to her.

Q. Here's Exhibit 22.
(EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION)
Q. This is Exhibit 22. Is this a text thread between you and Olga?
A. Yes.
Q. And is it Olga on the right in green and you on the left in white?
A. Correct.
Q. Okay. Down in the bottom left on the first page, what are you saying to Olga there?
A. One is perfect. The other one is I have to change our appointment. I'll make myself available tomorrow or Wednesday. Just found out I became a grandfather. I'm gonna go visit my daughter.

Page 99

Q. Okay. It's just that same, basically the same text thread we just looked at?
A. Yeah.
Q. Okay. I didn't cheat on this one and get a translated.
All right. Number 23, this is a couple emails from Olga to you earlier this year. Is that the case?
(EXHIBIT NUMBER 23 WAS MARKED FOR IDENTIFICATION)
A. Yes.
Q. Okay. And does she reference that meetings have been canceled and then had to be moved and rescheduled?
A. Correct. By both parties, I will add.
Q. Okay. Is she asking for any type of deliverable or progress report in these emails?
A. She is.
Q. Okay. And do you know if those were provided to her?
A. I don't recall.
Q. Okay. All right. I don't have any more questions.
(SIGNATURE WAIVED)
(DEPOSITION CONCLUDED AT 12:07 P.M.)

Page 100

STATE OF NORTH CAROLINA)
) CERTIFICATE
COUNTY OF RUTHERFORD )

I, Julie B. Surles, Verbatim Reporter and Notary Public, do hereby certify that, JAIME FERNANDO LOPEZ was duly sworn by me prior to the taking of this deposition; that said deposition was taken by me and transcribed by me and that the foregoing pages constitute a verbatim transcript of the testimony of the said JAIME FERNANDO LOPEZ. I do further certify that the persons were present as stated.

I do further certify that I am not of counsel for or in the employment of any parties to this action, nor do I have any interest, financial or otherwise, in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name, this 13th day of November, 2025.

Julie B. Surles
Notary Number: 201803900138

WOLF LAKE

30 de Octubre, 2021

Estimada Doña Olga,

Antes que nada, espero se encuentre bien.

Le escribo para documentar las fechas en que los fondos fueron recibidos.

Los fondos fueron recibidos en las siguientes fechas:

1) 11 de Enero, 2021 $180,000

2) 25 de Febrero, 2021 $320,000

3) 9 de Agosto, 2021 $500,000

Los intereses son calculados anualmente. En el caso que alguno de los proyectos se pase del termino de un año, el interés será calculado prorrateado mensualmente. Los intereses están estipulados en el documento que usted tiene en su poder. Ese documento tambien establece la taza de interés anual acordada. La taza es del 13% anual.

El lunes, nuestra oficina le enviara la informacion de Jackson County en cual demuestra que el terreno esta libre de gravamenes y a nombre de nuestra empresa, Wolf Lake Development.

Atentamente,

Saludos,

____________________

Manny Rodriguez
Wolf Lake Development

EXHIBIT
tabbies
B

# GUARANTEE AGREEMENT

This Guarantee Agreement (the "Agreement") is effective July 7,2021

**BETWEEN** : Wolf Lake Development, LLC and/or Assignee ("the Borrower") a company organized and existing under the laws of the NORTH CAROLINA of with its head office located at:

61 NORTH OAK RD, BREVARD NC, 28712

**AND** : MII HURON HOLDINGS, SA (the "Lender"), a company organized and existing with its head office located at:

CALLE 53 ESTE, URBANIZACION MARBELLA, HUMBOLT TOWER, PISO 2, PANAMA, REPUBLICA OF PANAMA

WHEREAS MII HURON HOLDINGS, SA [Lender] made available, as a loan, the amount of $500,000.00 to the Borrower pursuant to the terms and conditions of a Subscription Agreement entered into between the Lender and the Borrower.

WHEREAS the Borrower agree to guarantee the obligations of the Corporation for a maximum amount equal to 13% interest per year of the amounts owned by the Corporation. In case the Development is finalized before a 12- month period, the Lender will still receive the interest of 13% per year for the 12 Month period. If the Development is extended beyond the period of 12 months, the Lender will receive a monthly pro-rated interest based on the 13% interest per year agreed upon. Interest payments will commence on the date funds are received by Borrower.

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency and receipt of which are hereby acknowledged, the parties hereto have agreed as follows:

**GUARANTEES**:

Parcel ID: 8505-98-5127

Attachment A-Lots 1-10

Attachment B-Survey

## 1. INTERPRETATION

### 1.1 General Interpretation

Unless there be something in the subject or the context inconsistent therewith, words importing the singular only shall include the plural and vice versa, and words importing the masculine gender shall include the feminine gender, and vice versa.

### 1.2 Division into Articles

EXHIBIT C

The division of this Guarantee Agreement into Articles, Sections, subsections, paragraphs and subparagraphs and the insertion of titles are for convenience of reference only and do not affect the meaning or the interpretation of the present Guarantee Agreement.

**1.3 Preamble**

The preamble to this Guarantee Agreement shall form an integral part hereof, as if at length recited herein.

## 2. GUARANTEE

**2.1. Object of Guarantee**

The Borrower binds and obliges itself solidarity, absolutely and unconditionally for the due and punctual performance of 100% percent of all of the Borrower's obligations, undertakings and covenants under each one of the Debenture, expressly renouncing to the benefits of division and discussion. The Borrower undertake to perform such obligations, undertakings and covenants upon the occurrence of an Event of Default (as this expression is defined in each one of the Debenture) under either one of the Debenture, without notice or demand.

**2.2. Nature of Borrower's Obligations**

The Borrower's obligations hereunder are absolute and unconditional, present and continuing, unlimited, constitute a guarantee of payment and performance and not a guarantee of collection and shall remain in full force and effect until the earlier of (i) the performance in full of all of the Borrower's obligations, undertakings and covenants under each one of the Debenture and (ii) 2 years following the execution hereof. The Borrower hereby acknowledges that this guarantee is not attached to the performance of duties.

**2.3. No Release of the Borrower**

The liability and obligations of the Borrower or any one thereof hereunder shall not be reduced, limited, terminated or affected in any way should the Lender grant time, renewals, extensions, releases and discharges to the Borrower or others, accept from them other security or renounce to security which it may have at any time or accept compositions or otherwise deal with the Borrower or others or apply all money at any time received from the Borrower or others upon such part of the Borrower's obligations as the Lender deems reasonable and change any such application in whole or in part from time to time as the Lender may see fit. The Lender shall not be obliged to exhaust its recourses against the Borrower or others before being entitled to payment for which they are liable.

## 3. GENERAL PROVISIONS

**3.1 Governing Law**

This Guarantee Agreement shall be governed by and construed in accordance with the laws of the Province of [North Carolina].

**3.2 Counterparts**

This Guarantee Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

**3.3 Nullity**

Any provision of this Guarantee Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provisions in any other jurisdiction.

**3.4 Notices**

Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be in writing and shall be deemed to have been duly given or made to the party to which such notice, request, demand or other communication is required or permitted to be given or made under this Guarantee Agreement, when delivered to such party at its address and attention set forth with its signature below, or at such other address as any of the parties hereto may hereafter notify the others in writing. No other method of giving notice is hereby precluded.

**3.5 Remedies Cumulative, Waivers**

The rights and remedies of the Lender under this Guarantee Agreement shall be cumulative and not exclusive of any rights or remedies which it would otherwise have, and no failure or delay by the Lender, in exercising any right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

**3.6 Entire Agreement**

This Guarantee Agreement contains the entire agreement between the parties relating to the subject matter hereof.

**3.7 Acknowledgement**

The Borrower hereby acknowledges that:

3.7.1 the essential stipulations of this Guarantee Agreement were not imposed by the Lender and were negotiable; and

3.7.2 the clauses of this Guarantee Agreement, have been expressly brought to my attention and an adequate explanation of the nature and scope of the clauses thereof has been given to me.

**3.8 Death of Borrower's Member**

The Borrower hereby undertakes to advise the Lender of the death of any of its members as soon as it knows of same. The Borrower remains obligated to the Lender for the amounts due under this Agreement under the same conditions as stipulated in the terms stated above.

IN WITNESS WHEREOF, the parties have signed this Agreement at the date and the place first mentioned on this Agreement.

BORROWER

Authorized Signature

Jaime Lopez, President Wolf Lake Development ,LLC

Print Name and Title

July 7,2021

LENDER

Authorized Signature
ADMINISTRADOR

Print Name and Title

OLGA MARIA MONTENEGRO
ADMINISTRATOR
MIÌ HURONG HOLDING SA
omme56@hotmail.com
+573152579469

6 julio 2021

TIME MONTHS LOAN

# Attachment A



# Attachment B



July 7, 2021

# WOLF LAKE DEVELOPMENT, LLC

61 NORTH OAK RD, BREVARD, NC 28712

Contact info:

*Manuel Rodriguez*

Manny8450@yahoo.com

786-246-4444

*Jaime Lopez*

**Bmfcorp@yahoo.com**

**561-633-1914**

*Oneal McCall*

**Onealland@gmail.com**

**828-273-6551**

SINCERELY,
MANUEL RODRIGUEZ

PENGAD 800-631-6989 EXHIBIT 6

# GUARANTEE AGREEMENT

This Guarantee Agreement (the "Agreement") is effective December 20,2020,

**BETWEEN** : ONEAL LAND COMPANY (the "Guarantors"), a company organized and existing under the laws of the NORTH CAROLINA of with its head office located at:

61 NORTH OAK RD, BREVARD NC, 28712

**AND** : WOLF LAKE DEVELOPMENT LLC (the "Borrower"), a company organized and existing under the laws of the NORTH CAROLINA with its head office located at:

1944 HENDERSONVILLE RD, SUITE E-1, ASHEVILLE NC, 28803

**AND** : MII HURON HOLDINGS, SA (the "Lender"), a company organized and existing with its head office located at:

CALLE 53 ESTE, URBANIZACION MARBELLA, HUMBOLT TOWER, PISO 2,
PANAMA, REPUBLICA OF PANAMA

WHEREAS MII HURON HOLDINGS, SA [LENDER] made available, as a loan, the amount of $500,000.00 to WOLF LAKE DEVELOPMENT LLC pursuant to the terms and conditions of a Subscription Agreement entered into between the Lender and the Borrower and to which intervened the Guarantors on December 20, 2020.

Said loan to be made available in two separate transfers. First transfer in the amount of $180,000.00 to be made on December 22, 2020 and second transfer in the amount of $320,000.00 to be made in January 2021.

WHEREAS the Guarantors agree to guarantee the obligations of the Corporation for a maximum amount equal to 13% interest per year of the amounts owned by the Corporation to Mii Huron Holdings, S.A. In case the Development is finalized before a 12- month period, the Lender will still receive the interest of 13% per year for the 12 Month period. If the Development is extended beyond the period of 12 months, the Lender will receive a monthly pro-rated interest based on the 13% interest per year agreed upon. Interest payments will commence once funds have been received by burrowers.

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency and receipt of which are hereby acknowledged, the parties hereto have agreed as follows:

GUARANTEES:

Lot 3B
Vess Owen Rd, Tuckaseege, NC 28783
Pin # 8505-79-2027

Lot 1
Vess Owen Rd, Tuckaseege, NC 28783
Pin # 8505-89-1492

Model Home with issued Certificate of Occupancy by Jackson County in the State of NC located on Lot 3B



tabbies EXHIBIT D

## 1. INTERPRETATION

### 1.1 General Interpretation

Unless there be something in the subject or the context inconsistent therewith, words importing the singular only shall include the plural and vice versa, and words importing the masculine gender shall include the feminine gender, and vice versa.

### 1.2 Division into Articles

The division of this Guarantee Agreement into Articles, Sections, subsections, paragraphs and subparagraphs and the insertion of titles are for convenience of reference only and do not affect the meaning or the interpretation of the present Guarantee Agreement.

### 1.3 Preamble

The preamble to this Guarantee Agreement shall form an integral part hereof, as if at length recited herein.

## 2. GUARANTEE

### 2.1. Object of Guarantee

The Guarantors bind and oblige themselves solidarily, absolutely and unconditionally with the Borrower for the due and punctual performance of 100% percent of all of the Borrower's obligations, undertakings and covenants under each one of the Debenture, expressly renouncing to the benefits of division and discussion. The Guarantors undertake to perform such obligations, undertakings and covenants upon the occurrence of an Event of Default (as this expression is defined in each one of the Debenture) under either one of the Debenture, without notice or demand.

### 2.2. Nature of Guarantors' Obligations

The Guarantors' obligations hereunder are absolute and unconditional, present and continuing, unlimited, constitute a guarantee of payment and performance and not a guarantee of collection and shall remain in full force and effect until the earlier of (i) the performance in full of all of the Borrower's obligations, undertakings and covenants under each one of the Debenture and (ii) One year following the execution hereof. Each one of the Guarantors hereby acknowledges that this guarantee is not attached to the performance of duties.

### 2.3. No Release of the Guarantors

The liability and obligations of the Guarantors or any one thereof hereunder shall not be reduced, limited, terminated or affected in any way should the Lender grant time, renewals, extensions, releases and discharges to the Borrower or others, accept from them other security or renounce to security which it may have at any time or accept compositions or otherwise deal with the Borrower or others or apply all money at any time received from the Borrower or others upon such part of the Borrower's obligations as the Lender deems reasonable and change any such application in whole or in part from time to time as the Lender may see fit. The Lender shall not be obliged to exhaust its recourses against the Borrower or others before being entitled to payment from the Guarantors of the sums for which they are liable.

## 3. GENERALPROVISIONS

### 3.1 Governing Law

This Guarantee Agreement shall be governed by and construed in accordance with the laws of the Province of Miami, FL.

### 3.2 Counterparts

This Guarantee Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

### 3.3 Nullity

Any provision of this Guarantee Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provisions in any other jurisdiction.

### 3.4 Notices

Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be in writing and shall be deemed to have been duly given or made to the party to which such notice, request, demand or other communication is required or permitted to be given or made under this Guarantee Agreement, when delivered to such party at its address and attention set forth with its signature below, or at such other address as any of the parties hereto may hereafter notify the others in writing or electronically via email. No other method of giving notice is hereby precluded.

### 3.5 Remedies cumulative, Waivers

The rights and remedies of the Lender under this Guarantee Agreement shall be cumulative and not exclusive of any rights or remedies which it would otherwise have, and no failure or delay by the Lender, in exercising any right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

### 3.6 EntireAgreement

This Guarantee Agreement contains the entire agreement between the parties relating to the subject matter hereof.

### 3.7 Acknowledgement

Each one of the Guarantors hereby acknowledges that:

3.7.1 the essential stipulations of this Guarantee Agreement were not imposed by the Lender and were negotiable; and

3.7.2 the clauses of this Guarantee Agreement and of the Debenture, a copy of which being annexed hereto as Schedule N/A , have been expressly brought to my attention and an adequate explanation of the nature and scope of the clauses thereof has been given to me.

### 3.8 Death of Guarantors

The Borrower hereby undertakes to advise the Lender of the death of either one of the Guarantors as soon as it knows of same. Without liberating either one of the Guarantors who has died and whose succession remains obligated for the amounts due under this Guarantee Agreement at the date of his death, the Borrower shall, within 60 days provide the Lender with another equally solvent guarantor.

IN WITNESS WHEREOF, the parties have signed this Agreement at the date and the place first mentioned on this Agreement.

BORROWER

Authorized Signature

JAIME LOPEZ Wolf Lake Development, LLC
Print Name and Title

GUARANTOR

Authorized Signature

ONEAL LAND COMPANY
Print Name and Title

LENDER

Authorized Signature

Mii Huron Holdings, S.A.- Olga maria Montenegro
Print Name and Title

STATE OF NORTH CAROLINA IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

COUNTY OF JACKSON FILE NO. 25 CV 000462-490

MII HURON HOLDINGS, SA, )
)
Plaintiff, )
)
vs. )
)
WOLF LAKE DEVELOPMENT, LLC,)
O'NEAL LAND COMPANY, LCC. )
)
Defendants. )
___________________________________)

30(b)(6) DEPOSITION

FOR
O'NEAL LAND COMPANY, LCC
OF
ONEAL MCCALL
(Taken by Plaintiff)
Asheville, North Carolina
October 29, 2025

Reported by Julie B. Surles

Verbatim Court Reporter, Notary Public

Transcript produced by computer-aided transcription



EXHIBIT
E

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

MR. JOSHUA B. DURHAM, Esquire
MS. LANE GARDNER, Esquire
Bell, Davis & Pitt, P.A.
227 West Trade Street, Suite 2160
Charlotte, North Carolina 28202
Jdurham@belldavispitt.com

ON BEHALF OF DEFENDANTS:

MR. STEPHEN BARNWELL, Esquire
Barnwell & Long, PLLC
Post Office Box 430
Skyland, North Carolina 28776
stephen@barnwellandlong.com

ALSO PRESENT:
ONeal McCall



This is the 30(b)(6) DEPOSITION of ONEAL MCCALL, a witness called on behalf of Plaintiff, being taken before Julie B. Surles, Verbatim Reporter and Notary Public, and pursuant to North Carolina Rules of Civil Procedure, at the offices of Barnwell & Long, 2000 Hendersonville Road, Suite A, Asheville, North Carolina, on the 29th day of October, 2025 beginning at 12:13 P.M.



INDEX OF EXAMINATIONS

PAGE
BY MR. DURHAM. . . . . . . . . . . . . 5

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 24 | Notice of 30(b)(6) Deposition . | 6 |
| Exhibit 25 | Deed of Trust . . . . . . . . . | 41 |
| Exhibit 26 | Watts Realtor Complaint . . . . | 56 |



ONEAL MCCALL,
having been first identified and duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DURHAM:

Q. Could you please state your name for the record?
A. ONeal McCall.
Q. And Mr. McCall, I'm going to go ahead and apologize because from the moment I saw your name, I've been inclined to think ONeal was the last name, and I might get it backwards. So I apologize for that. Have you ever been deposed before?
A. No.
Q. Okay. You heard me mention the ground rules to Mr. Lopez in terms of make sure you verbally answer a question. Please try to wait for me to finish my question before you answer, and I'll do the same. Please ask me to rephrase a question if you don't understand it. Do you understand those rules?
A. Yes, sir.
Q. Okay. And if you need to take a break at all you've already seen, we're flexible. Just let me know.
A. Okay.
Q. I'm going to mark as Exhibit 24 --

MR. DURHAM: Stephen, if it's okay with you, we'll just do continuous numbers.
MR. BARNWELL: That's fine. Watch your --
Q. Yeah, it's hard for her to take huh-uhs and uh-uhs, so just --
MR. BARNWELL: You have to -- yes or no.
Q. Yes or no.
A. Okay.
Q. Let me show you what we've marked as Exhibit Number 24, which is the Notice of Deposition to ONeal Land Company. Have you seen Exhibit 24 before?
(EXHIBIT NUMBER 24 WAS MARKED FOR IDENTIFICATION)
A. I'd have to read it.
Q. Have you seen Exhibit 24 before?
A. I think that's the first time I've seen it.
Q. I will represent to you that the way depositions work in a lot of jurisdictions is when you want to get answers from an entity, you serve a notice like this, and you list all the topics you want to ask the entity about, and then the entity has to designate one or more people to testify as to the various topics. So that's what we've done. We've said, here are the items we want to ask ONeal Land Company about. I understand from your attorney that you, ONeal McCall, will be the individual giving answers about these



particular topics. Is that, do you have an understanding of that?
A. Yes.
Q. Okay. And are you prepared to testify as to these topics today?
A. Yes.
Q. What is your actual role at ONeal Land Company?
A. Well, I'm basically acquisitions and entitlements.
Q. And who are the owners of ONeal Land Company?
A. It would be myself and my son. And that's on record.
Q. And what's your son's name?
A. Walker.
Q. And has it been the two of you as the only owners since the company was formed?
A. Well, he's part. Beth is part owner, too, but she's not a voting member.
Q. Okay. She's got more of a, I guess what I'd call an economic interest in the entity?
A. (Nodding head up and down)
Q. Yes?
A. Yes.
Q. Sorry. And again, I'm not trying to give you a hard time. It makes her job easier.



How long ago was ONeal Land Company formed?
A. I think early 2000s.
Q. And you mentioned entitlement and acquisitions, some of the things that you do. Is that, describe ONeal Land Company's business for me?
A. Yes. I did land planning and engineering. Not that I engineer, but set up the engineer.
Q. What -- does it do actual development?
A. Well, so far, no.
Q. How many projects since it was formed has ONeal and Company been involved in?
A. Three or four.
Q. You count Wolf Lake as one of those three or four?
A. Yes.
Q. What were the others?
A. In Pinhook, I did one and Wolf Lake. Not Wolf Lake Development, but Wolf Lake.
Q. Any others that you recall?
A. Not right off.
Q. Were the Pinhook and the other Wolf Lake was that acquire the land, take it to entitlement, and then sell it off after that?
A. Wolf Lake and this one.
Q. Okay. What was Pinhook?



A. It was family land, but we just kind of divided it out.
Q. How did -- Mr. Lopez mentioned earlier in his testimony the salaries that were paid to you, to Manny and to himself as part of the Wolf Lake Development project. Was he correct that you, ONeal McCall, have received a salary from Wolf Lake Development as part of this project?
A. Yes.
Q. And what was the amount of that salary that you've taken?
A. 50,000.
Q. And is that paid monthly?
A. Yes.
Q. And is that -- are those payments still occurring?
A. No.
Q. When did those stop?
A. I don't remember.
Q. Do you know if it was before the hurricane or after the hurricane?
A. Before.
Q. And were those paid to you individually or were they paid to ONeal Land Company?
A. To me.

Page 10

Q. Does ONeal Land Company have anybody that takes a salary?
A. No.
Q. Has ONeal Land Company made any distributions to any of the members since the Wolf Lake project started?
A. Rephrase.
Q. Sure. So I understand that LLCs can sometimes make distributions to various members as funds are available.
A. No.
Q. It has not made any distributions?
A. No.
Q. Okay. Has any member of ONeal Land Company taken money out in any form since the beginning of The Wolf Lake Development project?
A. You need to rephrase that.
Q. Sure. Has -- we looked at some balance sheets earlier that showed Beth had a loan to Wolf Lake Development and then you had loans or a loan to Wolf Lake Development. Have you or Beth been paid back any portion of those loans?
A. No.
Q. Have you or Beth or Walker -- have Beth or Walker -- let me start that one all over again.

Page 11

Have Beth or Walker received any salary from Wolf Lake Development at all?
A. No.
Q. Have they received any salary from ONeal Land Company?
A. No.
Q. I understand there may have been -- have there been expenses, maybe they've incurred, they submitted for reimbursement from ONeal Land Company?
A. Yes.
Q. Okay. Site visits or things of that nature?
A. (Nodding head up and down)
Q. Yes?
A. Yes.
Q. Beyond reimbursement of those types of expenses, have there been monies paid by ONeal Land Company to you, to Walker or to Beth?
A. No.
Q. Do you know the maximum amount of those expenses that would have been paid?
A. No.
Q. Mr. Lopez testified that Beth runs the books for the Wolf Lake Development project. Is that accurate?
A. That is correct.
Q. Do you know if she receives any compensation

Page 12

for that?
A. No, she does not.
Q. Are there also separate books for ONeal Land Company?
A. Yes.
Q. And does she manage the books for that?
A. Yes.
Q. Beyond the Wolf Lake Development project that we've talked about with Mr. Lopez, are there any other projects that ONeal Land Company is currently involved in?
A. No.
Q. Since the Wolf Lake Development project started, was ONeal Land Company also involved in any other projects?
A. Say that again.
Q. Sure. Since the loans were made by my client to Wolf Lake Development, has ONeal Land Company been involved in any other projects?
A. No.
Q. Okay. So the Pinhook and the other Wolf Lake, those were all before my client loaned the money for these projects?
A. Pinhook would have been.
Q. Okay. What about that other?

Page 13

A. Yes. Wolf Lake would have been.
Q. Okay. All right. And then I think you mentioned a family land was a third one?
A. No, that's Pinhook.
Q. Okay. That is Pinhook. Gotcha. Okay. All right. How did -- we talked with Mr. Lopez a lot about the status of the Wolf Lake Development project. How would you characterize what's going on at project now?
A. Rephrase.
Q. Yeah. How would you -- I mean, I've never been out there. I've seen a lot of emails about updates. Where do things stand out there?
A. It's a beautiful piece of property, and it is -- we're actively trying to sell it.
Q. What's the -- do you have an understanding of what the value is of the Mountain Meadows larger tract?
A. Yes. Doing the CMA, it would be about 39,000 per acre.
Q. And you agree with that analysis?
A. I do.
Q. Do you know who did that?
A. It would have been out of the office.
Q. Out of the office, what do you mean?
A. My office.
Q. Okay. You've got the ability to do all of

Page 14

that?
A. Yes. Uh-huh.
Q. Okay. Is that a special software or how does that work?
A. It is a special software and MLS.
Q. Who has -- are you a licensed real estate broker?
A. I am.
Q. Is Beth?
A. Yes.
Q. Okay. And y'all are working unto yourselves. You or you're not working for a separate brokerage house or real estate company?
A. Beth is.
Q. Okay. Who is she working under?
A. Phantom.
Q. What is it?
A. Phantom.
Q. Phantom. Okay. Is that a local, active real estate company?
A. It's nationwide. Yes.
Q. All right. And then, so you were able to run the CMA by virtue of the MLS access that you all have by virtue of your licenses?
A. Yes.

Page 15

Q. Do you know when that was performed?
A. Less than six months.
Q. And so you have that. Is that a comprehensive electronic document that was created as part of that?
A. Yes.
Q. Okay. And it's got all the comps that were included in that?
A. Yes.
Q. Okay. And so it's something that's easy for you all to get to?
A. Yes.
Q. What about the value of the lot 3B, 1 and 2? How would -- what's your thought on the value on those?
A. Lot 2 is like two acres. So 200 plus on the lot. Lot 1 does have lake frontage. Just, it's where I can't put a dock. But it does have lake frontage. It's worth 150. 3B, extremely long-range views, and it's worth probably 200 or 175,000.
Q. And so this is where you get an English major trying to do math, which never turns out well. The $39,000 an acre on the larger tract is about 117 acres. Is that right?
A. That is correct.
MR. DURHAM: What's 117 times 39? You know what that winds up roughly being for that big tract. Is

Page 16

that 4,563,000? Would that be what that is? Yeah.
MS. GARDNER: Uh-huh.
Q. Is that right? Does that sound about right? $4 million for the larger tract?
A. Yes.
Q. Okay. Did the CMA include 1, 2 and 3B at all?
A. No.
Q. Do you know if there is a CMA you've done on those lots?
A. We can do it.
Q. But it has not been done thus far?
A. No.
Q. How would you characterize the -- I mean, you've been actively marketing and trying to sell these properties for a few years now, and I understand the correspondence that said Covid is throwing some setbacks in there. The hurricane certainly throwing some setbacks in there now. Are you optimistic they'll sell? What are your thoughts on where those stand and the prospects for those properties now?
A. I am optimistic.
Q. Mr. Lopez mentioned there's going to be a meeting in Florida in early November. Are you going to be participating in that?
A. No.

Page 17

Q. Are you optimistic that will result in something?
A. Yes.
Q. Does that -- is there something about that particular prospect that makes you suggest that's indeed the one that may pan out, whereas all the others didn't?
A. I don't know everything, so I can't answer that.
Q. What is your involvement in the Wolf Lake Development project?
A. Well, what I do, I get it entitled. I do a feasibility study, slope analysis, set up the survey, land planning, set up engineering, do computer work and soils and et cetera.
Q. And are there -- you create documents and reports and files as part of all of that work?
A. (No response)
Q. I mean, what -- with the soil, you say, I do soils. What does soils mean?
A. Soils, to make sure it is going to perk.
Q. Okay. So there's some kind of testing that goes on as part of that?
A. You hire a soil scientist.
Q. Okay. And that soil scientist then gives you some kind of report --

Page 18

A. Report.
Q. -- or sign off?
A. Uh-huh.
Q. And so you've got that or ONeal Land Company has that?
A. No, he has not finished it. He started it.
Q. Okay. He has started the soils on which properties?
A. Wolf Lake development.
Q. The Mountain Meadows --
A. Mountain Meadows.
Q. -- 117 tract?
A. Yes.
Q. Has he done anything on lots 1, 2 and 3B?
A. Yes.
Q. Has he finished those reports?
A. Yes.
Q. So he provided those to ONeal Land Company.
A. That is correct.
Q. So you would have those somewhere?
A. I would.
Q. And that's an email probably? Or saved down on a computer system?
A. Downloaded.
Q. Okay. And you talked about setting up

Page 19

engineering. What does that mean?
A. Meet with the engineering, engineer, tell him what we are looking to do, what we can do, and he tells us what we can do. And then that's where the 89 lots, or the 80 lots came from.
Q. Who is the engineer?
A. Victor Lopez. I mean, I'm sorry, Victor Lindquist.
Q. Now, I see that you're referring to some handwritten notes here today. What are those?
A. Feasibility, slope ordinance, survey, land planning, soils, entitlements, acquisition, computer work, engineering.
Q. Are you writing as you go, or did you prepare this ahead of time?
A. Well, wrote them right over there.
Q. Okay. During the course --
A. Yeah. Uh-huh.
Q. -- of events this morning? Okay. Is there -- I'll strike that.
And so the engineering, would that be same deal? He'd provide reports and thoughts and opinions and some type of report or communication?
A. Somewhat. But then we would have a land planner.

Page 20

Q. Okay. Has the engineering finished his reports for the larger tract?
A. No.
Q. Okay. That's currently underway?
A. Well --
Q. Or has he been called off?
A. Called off.
Q. Okay. Why was he called off?
A. Funds.
Q. Is he owed money still?
A. No, sir.
Q. Okay. He's all paid up?
A. Yeah.
Q. Do you know how much he was paid?
A. As far as I know, we don't owe any, anything on Wolf or Mountain Meadows.
Q. Okay. Except for Mr. Fernandez and my client and the loans?
A. The loans. Yeah.
Q. Do you know how much the engineer was paid?
A. No, but the land planner is the key.
Q. Why is he the key?
A. He's the visionary.
Q. Who is that?
A. Kevin Tucker.

Page 21

Q. And where does his work stand?
A. He finished. He finished it.
Q. And did he do some kind of report or grand plan for the property?
A. Yes, the 80 lots.
Q. How much was Mr. Tucker paid?
A. I don't recall right off. But it -- I don't recall it right off.
Q. Well, that would -- would expenses for any or all of these folks be reflected in some of those balance sheets that were prepared?
A. Yes.
Q. Okay. You mentioned doing the slope. Is it slope analysis? Is that what you said?
A. Yes.
Q. And do you do that or who do you hire somebody to do that?
A. I do it with the calculations, and then the county goes over it and does a final version.
Q. And entitlements, Is that you dealing with the county as well?
A. Yes.
Q. And so do you have records of your correspondence with the county on those items? You have emails with the county?

Page 22

A. Yes.
Q. And you discuss some of this in emails?
A. Yes.
Q. And you still have access to those?
A. Yes.
Q. Is that your personal email?
A. Yes.
Q. There's not a Onealland.com email address?
A. Well, it's Onealland@gmail.com.
Q. Okay. Does Beth do any communications on behalf of ONeal Land Company?
A. Not to my capacity.
Q. Okay, but if she may have some emails with a vendor about a bill or something like that maybe? I'm just guessing.
A. Yes.
Q. Okay. All right. If I were to go out and look at the larger tract, what kind of evidence would I see about development activity having occurred out on that tract?
A. After the hurricane or before the hurricane?
Q. Let's go before the hurricane.
A. Okay. The road work, the planning, the flags being set for the new road.
Q. Sorry, the what being set?

Page 23

A. Flags.
Q. Okay.
A. Lot lines on some of the lots.
Q. Are those -- is that staked out with flags or --
A. It is. Center line on some of the roads, the new roads.
Q. And what is the -- I mean, there's no paving out there, right?
A. No.
Q. Okay. This would be a paved community?
A. Yes.
Q. Okay, so what's the -- how do they do center lines? I just don't know. You said I'd see center lines for the roads. There's no paving. Is it just, is it hard, compacted, clear? What would the center line? Is that paint or just what is that?
A. Kevin gives me a DWG file, which is AutoCAD file. And on that there is the setbacks. And then you got the road base and then you got the center line. With that, we take the GPS out and the computer and we drive along the center line of what he has drawn out and lay the road out.
Q. And so what does laying the road out mean?
A. Where it would be.

Page 24

Q. What are you doing to mark that? Are you -- I guess I'm confused. Like, if I just walked on this property, would I see -- I definitely wouldn't see curbs and I wouldn't see paving out there, but I see distinct flattened roadways of some sort, just compacted from where somebody's run over it?
A. No. What we did was mowed it down nicely so it was just like a cow pasture.
Q. Okay.
A. And then we took the four by four and drove it down and put the flags down. Now, since the hurricane, it's --
Q. Has any additional development work occurred on the larger tract since the hurricane?
A. Just keeping the ditches open.
Q. But beyond that, any other development activity on the tract?
A. No major.
Q. What about, where do things stand on, in terms of the house that was built on lot 2?
A. Okay. It needs to be finished.
Q. And I think Mr. Lopez said HVAC, septic. I can't remember what else. What else?
A. Septic is in.
Q. Oh, septic is in. Okay. What else needs to be

Page 25

done for it to be finished?
A. The finish work inside, molding and the flooring, the finished flooring, the cabinets hung, paint it.
Q. Any idea what the cost will be to finish the home?
A. What he said was 200 to 250.
Q. Do you agree with that?
A. Well, I'm a land guy. So if you're talking -- I can't speak really to homes.
Q. Will there be a concrete driveway or what kind of driveway?
A. On that one, I envision a good compacted gravel drive.
Q. What has been done, if anything, on lot 1?
A. Lot 1 has been transformed from, there's a level building pad. The septic is, we've got the permits for the septic and the overrun on lot 2 and on lot 1, which is a combined, is a well site permitted.
Q. So you said septic permit, and I didn't catch that next word you said.
A. When you put in a septic, you've got to have, if that septic were to fail, you've got to have a backup system.
Q. Now, you mentioned lot 1 and 2 are combined.

Page 26

Is the -- what was the plan in terms of the number of houses on lots 1 and 2? And how were those going to be sold off?
A. Lot 1 was going to have one house. Lot 2, one house.
Q. Okay. And so they would each, then you'd sell off lot 1 with its one house and lot 2 with its one house?
A. Yes.
Q. What about the plan for 3B?
A. 3B would have -- it could, with the slope analysis, we worked that out where we could put probably three homes on it.
Q. So you would cut 3B up into three distinct parcels?
A. Yes, it could be done like that or sold as one.
Q. What has been done on lot 3B?
A. Cleared.
Q. But no building permit. Sorry. No building pad, no septic permits for 3B?
A. Septic, yes, permits.
Q. Okay. Right. But no building pad?
A. No.
Q. I've seen mention of 3B and 3A being combined in some drawings and diagrams. Wolf Lake or ONeal does

Page 27

not own 3A, correct?
A. No.
Q. Okay. I mentioned the Vaughans. Do you know the Vaughans?
A. I do.
Q. Is there some agreement between either Wolf Lake or ONeal and the Vaughans to maybe buy their property?
A. They was a verbal to begin with.
Q. Where does that stand now, if anywhere?
A. They backed out.
Q. When did they back out?
A. Early on.
Q. Okay. Have you ever had any communications with Olga or Carlos at all?
A. No.
Q. I was asking Mr. Lopez about lot 22. That apparently had come up in the mix as possible collateral early on, but then pulled back. Do you know the story on that?
A. I don't remember. Okay.
Q. Lot 22 was something that ONeal Land Company had owned?
A. Yes.
Q. And ONeal Land Company has since sold lot 22,

Page 28

correct?
A. Yes.
Q. Do you remember how much that sold for?
A. I believe it was 130 or 135.
Q. And then did you put that money into Wolf Lake Development?
A. Into the house over there.
Q. Into the house on lot 2?
A. Yes.
Q. Okay. So that is, to your knowledge, was all 500,000 of my clients money put into that house?
A. No. However, the house, the lot is north of 500,000 expense-wise.
Q. Okay, but was all of the. Do you know what happened with regard to my client's 500,000 that was to go to the construction of a home? Did all that money get put into construction of that home?
A. Rephrase that.
Q. Yeah. So My client made two loans.
A. Yes.
Q. So there's one in two parts.
A. Yeah.
Q. So it was 500,000 for some home. It originally said for a model home on 3B.
A. Uh-huh.

Page 29

Q. And then $500,000 for the larger tract.
A. Uh-huh.
Q. Two projects. Mr. Lopez testified 500 was for the one project, the other 500 for the other project.
A. Uh-huh.
Q. All that money has been spent, correct?
A. Yes.
Q. Okay, where did it all get spent?
A. All right. 3B for the lot clearing, one. And on lot 1, the grading, the making, the pad, and then the. Basically the rest for the house and the lot. So we had to buy the lot.
Q. Okay. You had to buy --
A. Lot 2.
Q. -- lot 2. Okay. Are you aware of any correspondence with my client about bringing lot 2 into the mix at all?
A. Other than what Jaime has told me.
Q. Okay, what did he tell you about that?
A. But he had conversations.
Q. Was that what he said this morning or was there some prior time he told you about that?
A. Prior.
Q. Do you recall if it was multiple or just one?
A. I don't remember.

Page 30

Q. And you recall about the -- to the best of your memory, what he said about that conversation with Olga?
A. I don't remember.
Q. Do you know, when you bought or when -- who bought lot 2? Did Wolf Lake buy lot 2?
A. Yes.
Q. Okay. Did it buy it separately from when it bought lot 1?
A. Say that again?
Q. Yeah. Did it buy, did it buy a lot 1 and 2 together?
A. No, it was 1 and 3B and we bought lot 2.
Q. Okay. All right. Do you know -- you're saying that some of the funds from my client went to buy lot 2?
A. Yes.
Q. Do you know who you bought lot 2 from?
A. I don't remember.
Q. How did ONeal get connected with -- how did ONeal Land Company get connected with Manny and Mr. Lopez?
A. Through a friend. I met Jaime.
Q. And when did you, when did that occur?
A. I don't remember.
Q. How about Manny? How did you get connected with Manny?

Page 31

A. Jaime brought him up here.
Q. Had you ever known of Jaime Lopez before you met him?
A. I had heard about him.
Q. This Valle Verde project that I talked about with him, are you aware of that project at all?
A. With what?
Q. The Valle Verde or Valle --
A. I know I've been to it but --
Q. Had you heard of Manny at all before Jaime brought him up?
A. No.
Q. And how to tell me how sort of all of this Wolf Lake Development idea and thought came together? How you wind up finding Wolf Lake Development? How did all that come about?
A. Rephrase.
Q. Yeah, I mean, were you -- you were looking to get involved in some new development, I take it and then a friend introduced you to Jaime. Whose idea was it to form Wolf Lake Development, LLC?
A. Well, when Jaime looked at the property and he fell in love with it, I told him we could probably potentially buy it.
Q. Did you -- were you the one that introduced him

Page 32

to the property?
A. Yes.
Q. So you had your eye on it at some point?
A. Yes.
Q. Okay. And you had some portion of it before showing Jaime the property, is that right?
A. (No response)
Q. I thought that you might have, ONeal Land Company Might have acquired some of this property back in, like, 2019. Am I wrong on that?
A. No, I -- not before we bought the property.
Q. Okay, and when you say we bought the property, you're including Jaime and Manny?
A. Yes.
Q. Okay. But you -- I think I said you introduced them to the property, though?
A. Yes.
Q. So how had you stumbled upon this property?
A. Well, I've been passing it for years.
Q. Okay, so is it -- and I don't know the area. Is it -- it's on your way from somewhere to somewhere else that you pass it on a regular basis or just, why do you happen to be driving that particular area?
A. Particular area, But I drove a school bus, and I had to go up there and pick up kids and bring it down.

Page 33

Q. Okay. When did you start doing that?
A. When I got graduated high school.
Q. Okay.
A. Or before.
Q. I don't mean to insult you, but that's been --
A. That's been a long time.
Q. It's been a while. I'm in the same boat. So has it always been in your head since then, like, oh, that'd be some nice property to maybe have or develop some day?
A. Well, I guess when I got into real estate, that's when it kicked in.
Q. Okay, and were these -- you didn't acquire lot 1 and 3B and the large tract all at the same time, did you?
A. No.
Q. Those were owned by different people?
A. 1 and 3B, I had had for a long time.
Q. Sorry, who had had that for a long time?
A. ONeal Land Company.
Q. Okay, well, that's what I was trying to get at. You had those since before Jaime came on?
A. Yes.
Q. And so when you introduced Jaime to the property, you already owned lot 1 and 3B?

Page 34

A. Yes.
Q. Okay. And so when you first introduced him to the property, was -- you had this verbal deal with the Vaughans on 3A at the time?
A. Yes.
Q. Okay. So you said, hey, you know, we can work in the property I already own. The Vaughans may work in 3A as well?
A. Yes.
Q. Was lot 2 on the radar at that point?
A. Don't think so.
Q. And then what about the larger tract? That was what you were also looking at at the beginning with Jaime?
A. Yes.
Q. And do you remember who owned the larger tract?
A. Lacy.
Q. Okay, who -- is that somebody you know?
A. Lacy Corporation. I knew his dad, but we bought it from Doug.
Q. Okay. All right. And were there any other lots out in this general area? Actually, let me back up.
The lot 22 that ONeal owned, did it own lot 22 by the time you're introducing Jaime to these properties?

Page 35

A. Yes.
Q. Okay. And so you introduced Jaime to the property. Where did things go from there?
A. For Mountain Meadows?
Q. Or for the lot 1 and 3B. Did they run different tracts with Jaime?
A. (No response)
Q. All right, let me back up. You introduced Jaime to the property?
A. Yes.
Q. The property being 1, 3B, maybe 3A, possibly 22 and the larger tract?
A. Yes.
Q. You looked at all of it at the same time?
A. Uh-huh.
Q. Generally around the same time?
A. (Nodding head up and down)
THE REPORTER: Yes?
Q. Yes?
A. Yes.
Q. Jaime expresses an interest in it?
A. Yes.
Q. Okay. And then did, where did things go? It's like, all right, let's, let's pursue buying in the large tract, and let's make that happen. And did that run at

Page 36

the same time you're folding in the other properties? I'm just trying to figure out the timeline.
A. I don't remember.
Q. Okay. But somebody has the idea. Jaime says, all right, I'm on board. I'll introduce you to Manny. Let's form Wolf Lake Development, LLC.
A. Yes.
Q. Is there discussions about how the membership breakdown, interests are going to work on that?
A. Well, they take the -- rephrase.
Q. Yeah. Is it a third, a third, a third?
A. Basically.
Q. Okay. Now, Mr. Lopez said it sounded like Manny had been paid more than you and he had been paid?
A. Yes.
Q. Okay. Why is that?
A. I don't know.
Q. Is that a sore spot for you? Is that --
A. No.
Q. -- make you annoyed or angry at all?
A. No.
Q. Okay. Do you think there's a good reason he's been paid more?
A. He knew a lot of people and where he could -- and he's in Miami.

Page 37

Q. Has he -- it sounds like you've been involved a lot with soils, engineering, the master plan. Is Manny's involvement just trying to find potential buyers? Or what's his involvement?
A. Basically, plus more.
Q. Okay. What's the plus more?
A. Well --
Q. I'm just -- I just want to understand. I said that the --
A. Potential --
Q. This is not my area --
A. -- potential buyers.
Q. -- of expertise. Okay. And then what would you say Jaime's role has been?
A. A spokesman.
Q. He has not been involved in the soil, the slope, the engineering? Is that all your responsibility?
A. He looks at me.
Q. Okay. Do Jaime or Manny have any ownership of ONeal Land Company?
A. No.
Q. Your ownership in Wolf Lake Development is your personal interest. In other words, ONeal Land Company doesn't hold a membership interest in Wolf Lake, does it?
A. Say that one more time?

Page 38

Q. Yeah. The ownership of Wolf Lake Development is Manny individually, Jaime individually, and you individually?
A. Yes.
Q. Sometimes you see an entity like ONeal Land Company actually holding that membership interest. ONeal Land Company does not have --
A. Uh-uh. No.
Q. -- ownership in Wolf Lake? Okay. Sorry. No?
A. No.
Q. We talked over each other there. Okay. All right. Have there been payments of any funds from Wolf Lake Development to ONeal Land Company at all?
A. No.
Q. As the Guarantee Agreements we've looked at, Wolf Lake Development is listed as the borrower. ONeal Land Company is listed as the guarantor. Is that your understanding? And we can look at these. Let me see if I can find one of them.
A. Can I run to the restroom?
Q. Sure. Yeah. We can go off the record.
(RECESS TAKEN FROM 1:03 P.M. TO 1:07 P.M.)
BY MR. DURHAM:
Q. I've handed you what was previously marked as Exhibit 6. Have you seen Exhibit 6 before?

Page 39

A. Let me read it. Okay.
Q. Do you know who drafted Exhibit 6?
A. Do not know.
Q. It references ONeal Land Company as a Guarantor up at one of the very first lines. Do you see that? Where it says between ONeal?
A. Yes.
Q. What's your understanding of what guarantor means?
A. I'm guaranteeing lot 3B and lot 1.
Q. Do you have -- so you don't dispute that my client loaned Wolf Lake a million dollars, correct?
A. Yes.
Q. You do dispute it?
A. No.
Q. Okay. Sorry. Sometimes -- all right. So just to be clear, you admit that my client loaned Wolf Lake a million dollars?
A. Yes.
Q. Okay. All right. $500,000 for 1 and 3B and 500,000 for the larger tract?
A. Yes.
Q. And you admit that at some point Wolf Lake has to pay that money back, correct?
A. Yes.

Page 40

Q. Okay. With interest?
A. Yes.
Q. And did ONeal Land Company guarantee the repayment of that debt? In other words, if Wolf Lake doesn't pay for some reason, ONeal Land Company guarantees they'll be repaid. If you have an understanding or not, I'm just trying to --
A. I don't know. I don't have an understanding.
Q. Okay. Do you have any understanding that lot 1 and 3B were to serve as collateral for the $500,000 loan by my client?
A. Yes.
Q. Are you aware of what a deed of trust is?
A. Yes.
Q. Okay. Do you know why a deed of trust was not done for these loans?
A. I don't know.
Q. But is that your understanding? That's what this document was to be, was to act as a deed of trust?
A. I don't know.
Q. Okay, but the -- did you have involvement -- who is Juan Fernandez?
A. Jaime's friend.
Q. And he loaned some money for the larger tract?
A. Yes.

Page 41

Q. Is $400,000, is that the right amount?
A. Yes.
Q. And the larger tract was given as security for that loan, correct?
A. Yes.
Q. Okay. And an actual deed of trust was done for Mr. Fernandez. I'm gonna see if I can put -- actually don't know if I ever marked that one. Did you have any involvement or dealings directly with Mr. Fernandez?
A. No.
Q. Okay. That was something Jaime handled?
A. Yes.
Q. Okay. Marking Exhibit 25. Have you ever seen Exhibit 25 before?
(EXHIBIT NUMBER 25 WAS MARKED FOR IDENTIFICATION)
A. Don't think so.
Q. Have you seen deeds of trust before in connection with your development and acquisition work?
A. Yes.
Q. And what do you understand the purpose of a deed of trust is?
A. To hold the property.
Q. To show that the property is security or collateral for a loan?
A. Yes.

Q. And it can show up in title. So if somebody's looking at property, they know there's a loan against that property?
A. Yes.
Q. And it says that Barnwell & Long is the trustee on this Juan Fernandez deed of trust. Do you see that?
A. Yes.
Q. And it looks like Barnwell & Long down at the bottom was the one that prepared it as well. Do you see that?
A. Yes.
Q. And it actually says that right up above the deed of trust caption. It says, instrument prepared by Barnwell & Long. You see that?
A. (No response)
Q. Right above that empty box?
A. Yes.
Q. Yep. Do you know if Barnwell & Long ever prepared a document called Deed of Trust for the loans from my client?
A. I don't know.
Q. Okay. Do you know who at Wolf Lake or ONeal would have been the one to direct Barnwell & Long to do that if that were done? Would that be you or would that be Jaime? Who would be the main point of contact there?



A. Myself.
Q. Were you the one involved in seeing that this Deed of Trust was done, this Exhibit 25?
A. No.
Q. Do you know if Jaime was the one doing that?
A. Jaime is the one that signed it.
Q. Okay. All right. Do you know if ONeal Land Company is a guarantor of the Juan Fernandez debt at all?
A. No.
Q. You don't know or --
A. I don't know.
Q. Okay. Do you know if ONeal Land Company has signed anything in connection with the Juan Fernandez loan?
A. I don't know.
Q. I forgot to ask. Does Beth keep books for any other company besides Wolf Lake and ONeal Land Company?
A. She is retired, basically.
Q. Does she have a CPA or accounting background?
A. Yes.
Q. Okay. Did she work for a CPA company? Is she a licensed CPA?
A. Yes.
Q. Okay. Does she still have her license?
A. Yes.



Q. And did she work in public accounting for most of her career?
A. Yes.
Q. Okay. But do you know if she's running, keeping the books for any other entity?
A. I don't know.
Q. And is any compensation she would get from doing the books for Wolf Lake and ONeal Land Company, she'd see that if the properties were ever sold and money came in and she just would naturally get the benefit of some of that because some of it would come to you? I'm just trying to figure out why she's doing, why is she doing the books for those two companies?
A. (No response)
Q. She's just that good of a person?
A. Yeah.
Q. We all have saints like that in our life, and they're nice to have.
So there was some discussion about a FEMA application with Mr. Lopez. I believe that some funds from the FEMA application we're going to be used to finish the house?
A. Yes.
Q. But that just sort of died?
A. Yes.



Q. Was that an accurate description of that?
A. Yes.
Q. Okay, let's look at what was previously marked as Exhibit 13. Let me see if I can find that. Have you ever seen Exhibit 13 before?
A. No, not that I know of.
Q. As best you know, would Beth be the one preparing balance sheets for Wolf Lake Development, LLC?
A. As far as I know.
Q. Are you aware of anybody else that would have the ability to be able to do that?
A. Manny.
Q. Manny would?
A. (Nodding head up and down)
Q. Does Wolf Lake Development run QuickBooks, do you know?
A. I don't know.
Q. Does ONeal Land Company run QuickBooks?
A. No.
Q. Does ONeal Land Company have a project set up in its bookkeeping for this project? In other words, could ONeal Land Company run a balance sheet for the Wolf Lake project?
A. For the Wolf Lake Development? I mean, ONeal Land Company?

Q. Yeah, for the -- yeah.
A. Yeah, we'd have a balance sheet.
Q. And, like, what kind of things for the projects would ONeal show on its balance sheet? You get what I'm saying? Like this balance sheet on Exhibit 13 that we're looking at is all from Wolf Lake's perspective. It's got all the expenses that's paid on these different lots and the liabilities and things like that. Does ONeal Land Company. Is it keeping tract of anything for itself with regard to these particular lots?
A. It would on ONeal Land Company, 1, 3B and 2.
Q. Okay. And so it would be able to generate balance sheets for 1 and 3B and -- okay. All right, let's look at that last page of Exhibit 13. The loans that I asked Mr. Lopez about. There's a Beth loan, a Jaime loan, and an ONeal loan. Is the Beth loan $3,000 to the best of your knowledge?
A. Yes.
Q. How did she come to pay, make a loan of $3,000 as opposed to just including it in one of yours?
A. She wrote it out of -- I don't remember.
Q. You know, she did that individually or she made that from ONeal and Company?
A. Individually.
Q. Okay. Is there any agreement with her as to



what the terms of that payback will be?
A. None that I'm aware of.
Q. Did you ask her to make that loan?
A. I don't remember.
Q. Do you know if Jaime asked her to make that loan?
A. I don't know.
Q. Do she and Jaime communicate regularly?
A. Some.
Q. Okay. Is the ONeal loan amount that's listed on this Exhibit 13, is that accurate?
A. Probably.
Q. Do you have any reason to doubt that number?
A. No.
Q. Do you know who the -- Mr. Lopez testified he thought that Investor Loan 5 was them borrowing money to hold some of these events on the larger tract. Right above Beth's loan.
A. All right. Okay. Yeah, I know he got $30,000.
Q. Okay. Do you have any reason to doubt that that's what that Investor Loan 5 represents?
A. No.
Q. What about the -- go down a little bit, the Investor loan of 530,000, do you know who that is?
A. No.



Q. What about the investor loan 2 for 500,000? Who is that?
A. I don't know.
Q. What about Investor loan 4 of 300,000, do you know who that is?
A. I don't know.
Q. What about investor loan 3 of 40,000, do you know who that is?
A. I don't know.
Q. Beyond Beth, yourself, Jaime, my client, and Juan Fernandez, can you tell me who, are there any other investors in the Wolf Lake projects?
A. Not that I can recall.
Q. All right. Did you have any direct dealings with David Lane?
A. Just going to dinner with the group.
Q. When did that happen?
A. When he was coming up here and looking at the property.
Q. Was that before the loans from my client?
A. I believe so.
Q. Do you know if there's any kind of written agreement with Mr. Lane at all?
A. I don't know.
Q. Mr. Lopez talked about a finder's fee that he



was paid. Is that, do you have any reason to -- is that your understanding as well that he was paid a finder fees?
A. Yes.
Q. Is he still involved in the projects at all?
A. I don't know.
Q. There was -- we looked at an email earlier that Mr. Lopez had made reference to my client that communications had stopped with Mr. Lane. Do you recall anything about stopping communications with Mr. Lane?
A. I don't recall.
Q. You don't know?
A. Uh-uh.
Q. No?
A. No.
Q. Mr. Lopez testified that it sounds like there could be a proposal to my client to take some number of lots in satisfaction of the debt. Do you recall him testifying about that?
A. Yes.
Q. Is that a proposal that you think could be done?
A. Yes.
Q. Okay. You'd be open to it?
A. Yes.

Page 50

Q. Okay. What's your understanding -- do you have any understanding about why the Fernandez foreclosure hearing was put postponed from Monday?
A. I don't know.
Q. Are you in communication with Mr. Fernandez at all?
A. No.
Q. Has Mr. Lopez told you about any communications he's having with Mr. Fernandez?
A. No.
Q. And you're aware Mr. Fernandez does indeed have a lien against the larger tract, correct?
A. It's in here.
Q. Okay. And I asked Mr. Lopez about Valley Song Redevelopment. Do you know that group?
A. I do.
Q. Who is that group?
A. Meg Weinberg.
Q. What was it?
A. Meg Weinberg.
Q. And who was Meg Weinberg?
A. Valley Song.
Q. Is that somebody -- how do you know her?
A. She loaned me the money.
Q. And when did she -- how did you come to make

Page 51

her acquaintance or get connected with her?
A. Through a friend.
Q. And why were you being connected with her for a loan?
A. To come out of bankruptcy.
Q. And who was the friend that introduced you?
A. I just remember it was a friend.
Q. Is Meg local?
A. I think Charlotte.
Q. Is Meg or Valley Song, are they in the loan business?
A. Yes.
Q. Okay. And what amount did you get loaned from Valley Song?
A. 220.
Q. 220,000?
A. Yeah.
Q. And Valley Song took a deed of trust against some property in this area, correct?
A. Yes.
Q. Lot 1?
A. Yes.
Q. Lot 3B?
A. Yes.
Q. Lot 22?

Page 52

A. Yes.
Q. Any other lots?
A. Yeah, other properties.
Q. Okay. Do you know what other properties?
A. Yeah, they're split up.
Q. Any of the ones we've been talking about in connection with my client?
A. No.
Q. Okay. Is the money still owed to Valley Song?
A. Paid off.
Q. When was that paid off?
A. 3B, immediately. Lot 1, just thereafter or -- I don't remember when, but it's paid.
Q. Any reason why Valley Song has not canceled or mark that deed of trust as satisfied?
A. No.
Q. You would expect it to be satisfied?
A. Yes.
Q. The liens against 3 -- actually, let me find my document for us. Show you what I marked previously as Exhibit 14. And I just want to ask the date. That is what I understand to be the Deed of Trust in favor of Valley Song in connection with the loan that you mentioned. What was the date of the recording of that document?

Page 53

A. 1/18/19.
Q. And does that correspond with your memory of when the loan was obtained from Valley Song?
A. Yes.
Q. And then we looked at Exhibit 15 with Mr. Lopez and that was a partial release from the lien of lot 3B that was recorded July 13, 2021. Do you recall that being around the time of lot 3B being paid off?
A. Probably.
Q. We looked at Exhibit 16, which is a loan or, sorry, conveyance from ONeal to Wolf Lake of 3B. And you can check the property description at the end to confirm that, if I'm representing that correctly. Does that lot 16 (sic) convey 3B Wolf Lake Development?
A. I believe so.
Q. And so is it your understanding that that conveyance would have occurred after 3B had been paid off with Valley Song?
A. Yes.
Q. Which may have been around the time that Valley Song released that property from its lien, correct?
A. Yes or -- yes.
Q. What I'm then trying to find out is lot 3B, the first loans my client made and the two payments was for lot 1 and 3B, is that your understanding?

Page 54

A. Yes.
Q. Okay, so half a million dollars. So According to Exhibit 3, that half a million dollars was completed February 25th of 2021. I think we've all agreed that that's when those first two payments were made.
By the documents, the deed and the release, we're looking at lot 1 and 3B was subject to a lien to Valley Song at the time. It hadn't been paid off. Do you have any reason to doubt that timing?
A. Lot 3B was paid off immediately. Once the funds cleared, it was paid off immediately and lot 1 thereafter.
Q. Okay, so you used some portion of the 500,000 to pay off the 220 that was owed to Valley Song?
A. No, it was -- it had been paid down. Like, the last payment was 40,000.
Q. Okay, so you used some -- did you use then some portion of the money for my client to pay off that previous loan?
A. Yes.
Q. Okay. The Wolf Lake did not pay ONeal Land Company for lot 3B? Is that your understanding?
A. No.
Q. Do you know if my client was ever told that part of the money was going to pay off an existing lien

Page 55

against lot 3B?
A. I don't know. I talked with Manny.
Q. Okay. Did Manny ever tell you if he discussed Valley Song with Olga at all?
A. Not to my recollection.
Q. And again, it's your testimony today that Valley Song has been completely paid in full?
A. Yes.
Q. Was the -- I asked Mr. Lopez about an entity named Watts Realtors & Auctioneers. Do you know that company?
A. Yes.
Q. Was there, they had gotten a judgment against you at some point?
A. Yes. Through bankruptcy. And they were paid off totally, 100 percent. Everything. I don't know if, I think, it's Chapter 13 that you pay everything back. Yeah, I just paid every, everybody was made whole.
Q. Was part of the Valley Song loan to make those payments, to take care of that?
A. Yeah.
Q. What was the nature of that underlying original judgment from Watts? That was up in Kentucky, from what I understand?
A. Yeah. For a piece of property that we had

Page 56

bought up by there.
Q. Okay. And they, are you aware of a fraudulent transfer lawsuit they brought against you in bankruptcy for moving lots 1, 3A and 3B at all?
A. No.
Q. Okay. Show you what I'm marking as Exhibit 26. Have you seen this Exhibit 26 before?
(EXHIBIT NUMBER 26 WAS MARKED FOR IDENTIFICATION)
A. It's been a long time.
Q. And I understand this is all part of what ultimately got resolved in the bankruptcy, correct?
A. Yes.
Q. Watts Realtors got paid off in full?
A. Uh-huh.
THE REPORTER: Yes?
A. Yes.
Q. But it did file a lawsuit at some point in here, in Jackson County against you, ONeal McCall, correct?
A. Yes.
Q. Okay.
A. Well, ONeal Land.
Q. Well, it's got ONeal McCall.
A. Okay. All right.
Q. If you go to the first page, you'll see your

Page 57

name in the caption.
A. Got you. All right.
Q. And ONeal Land Company as well as Laura Green. Who is Laura Green?
A. She was one of my partners way back when. She's dead now.
Q. But it says in paragraph, let's see, where's the four parcels? In paragraph 14 on page two, it says, eight days after the non-jury trial to determine damages, "Defendants Laura Green, O'Neal McCall and William Burrell conveyed four parcels of land in Jackson County to Defendant ONeal Land Company." Do you see that?
A. Yes.
Q. Okay, and then it says that the deed for that is attached as the Exhibit B. You see where it makes that reference?
A. Yeah.
Q. Don't go to Exhibit B just yet. And then it says in paragraph 17 that ONeal Land Company conveyed parcel 3A to Joseph Vaughan and Lori Burrell Vaughan. Do you see that?
A. Uh-huh. Yes.
Q. And now if you go to the Exhibit B, there's a warranty deed. It's got a little Exhibit B sticker down at the bottom. See that Exhibit B sticker down at the

Page 58

bottom there?
A. Yep.
Q. Okay. And then if you go to the property description, it's got, this was the deed to ONeal Land Company. It's lot 1, lot 3A, lot 3B and lot 22. You see that?
A. I see 3A.
Q. Yeah, you might need to go back a little more. Does that say B down at the bottom corner?
A. Yeah.
Q. Yep, yep. So, yeah, then you can look at the property description and see 1, 3A, 3B and 22. Yeah, keep flipping. Just go to the next page. Do you see that deed on Exhibit B has got lot 1, lot 3A. And you go to the next page, you'll see 3B and 22 in there. You see? Confirm now?
A. Okay.
Q. All right, you see Lot 1, Lot 3A and Lot 3B and Lot 22.
A. Yes.
Q. Okay. That's part of this deed that's attached to this lawsuit by Watts Realtors, correct?
A. (Nodding head up and down)
THE REPORTER: Yes?
A. Yes.

Page 59

Q. All right, if you go back to the Complaint, so go back to the first page. Actually, go to the third page of it. There's a section called First Cause of Action, Fraudulent Conveyance. Do you see that?
A. Uh-huh.
Q. Okay. Yes?
A. Yes.
Q. All right. So what I'm trying to find out, do you know if anybody ever told my client that lots 1 and 3B that were a part of their deal had been subject of a fraudulent conveyance action at any point? Anybody ever tell my client that?
A. I don't know.
Q. Did you ever tell your business partner, Jaime Lopez that that was the history of some of these properties?
A. It was already taken care of.
Q. Okay, but you didn't -- you never told him that?
A. Not that I can recall.
Q. Did you ever tell Manny Rodriguez that?
A. Not that I recall.
Q. Do you recall during your bankruptcy case there might have actually been a contract for lot 1 and 3B to sell it?

Page 60

A. Yes.
Q. Do you recall what happened with that, why it fell through?
A. It fell through.
Q. Okay. You remember any details on why?
A. No.
Q. Okay. Do you remember any attempt to auction off those lots as part of the bankruptcy?
A. Yes.
Q. What happened with that?
A. It didn't happen.
Q. You remember if there was any interest at all?
A. Some interest, but it didn't materialize.
Q. Since the Wolf Lake Development started, since the lot 1, 2, 3B project and the Mountain Meadows project started, have you taken any salary out of ONeal Land Company?
A. No.
Q. You've taken salary from Wolf Lake Development though?
A. Yes.
Q. Have you taken any other -- have you taken any distributions out of ONeal Land Company?
A. Not that I'm aware of.
Q. And I think asked and I think the answer was,

Page 61

was you've not taken any distributions out of Wolf Lake Land Company beyond just salary that you're aware of. Is that correct?
A. That is correct.
Q. One of the -- we have alleged in our lawsuit that ONeal Land Company and Wolf Lake Development have breached the loan agreement by not paying back these loan amounts.
A. I'm sorry, say again?
Q. Yeah. We've alleged that ONeal Land Company and Wolf Lake are in breach for not paying the loan amounts back to my client.
A. Yes.
Q. ONeal Land Company and Wolf Lake have denied that there's a breach. They admit the loan. They admit they got the money. They admit they have to pay it back at some point, but they dispute that there's a current breach. Is that your position? And if so, why is that your position?
A. I don't know.
Q. Okay, but you admit that at some point this money needs to be paid back to my client, correct?
A. Yes.
Q. It wasn't a gift?
A. No.

Q. Let me --
MR. DURHAM: You had a question earlier about somebody's name.
MS. GARNDER: Oh, yeah, the engineer, Victor something.
Q. Yeah. What was Victor's last name?
A. Lundquist.
Q. How do you spell that?
A. I can't spell.
Q. Lundquist with a U or Lindquist with an I, do you think?
A. I can't spell.
Q. Do you know the -- do you know his company?
A. Lindquist.
Q. Okay. Is he local?
A. Sylva.
Q. What's that?
A. Sylva.
Q. Okay, Sylva. All right.
A. However, Kevin is the main guy.
Q. And that was Kevin Tucker?
A. Yes.
MR. DURHAM: Let's take a few minutes off the record.
(RECESS TAKEN FROM 1:57 P.M. TO 2:03 P.M.)



BY MR. DURHAM:
Q. All right. Mr. McCall, I was asking Mr. Lopez earlier about First Bank. Do you know if that's where Wolf Lake Development has its accounts?
A. Yes, sir.
Q. Okay. Is that where ONeal Land Company has its account?
A. No.
Q. Okay, where does it bank?
A. Carolina -- I mean, United Community.
Q. What is it?
A. United Community.
Q. Okay. And is that where you bank personally as well?
A. Yes.
Q. I've seen some documents that has you at 61 North Oak Street, Brevard. Is that your address?
A. That is correct.
MR. DURHAM: I don't have any more questions.
MR. BARNWELL: I don't have any. You're excused.
(SIGNATURE WAIVED)
(DEPOSITION CONCLUDED AT 2:05 P.M.)



STATE OF NORTH CAROLINA)
) CERTIFICATE
COUNTY OF RUTHERFORD )

I, Julie B. Surles, Verbatim Reporter and Notary Public, do hereby certify that, JAIME FERNANDO LOPEZ was duly sworn by me prior to the taking of this deposition; that said deposition was taken by me and transcribed by me and that the foregoing pages constitute a verbatim transcript of the testimony of the said JAIME FERNANDO LOPEZ. I do further certify that the persons were present as stated.

I do further certify that I am not of counsel for or in the employment of any parties to this action, nor do I have any interest, financial or otherwise, in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name, this 13th day of November, 2025.

Julie B. Surles
Notary Number: 201803900138

#26

FILED

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| JACKSON COUNTY | 13 CVS 494 |

2013 ... 2: ...

JACKSON ...

EXHIBIT 26

WATTS REALTORS AND AUCTIONEERS, INC.,
Plaintiff,

v.

LAURA R. GREEN, WILLIAM M. BURRELL, O'NEAL MCCALL, WILLIAM W. MCCALL, JOSEPH P. VAUGHAN AND WIFE, LORI B. VAUGHAN AND O'NEAL LAND COMPANY, LLC
Defendants.

## COMPLAINT

COMES NOW Plaintiff Watts Realtors and Auctioneers, Inc. (hereinafter "Watts Realtors") and complains of the Defendants as follows:

1. Plaintiff Watts Realtors is a Kentucky corporation that submits itself to the jurisdiction and venue of this court.

2. Defendant Laura R. Green ("Green") is a citizen and resident of Transylvania County, North Carolina, currently residing at 474 Twin Ponds Lane, Lake Toxaway, North Carolina 28747. She is subject to the venue and jurisdiction of this court.

3. Defendant William M. Burrell ("Burrell") is a citizen and resident of Transylvania County, North Carolina, currently residing at 724 Gray Fox Road, Rosman, North Carolina 28772. He is subject to the venue and jurisdiction of this court.

4. Defendant O'Neal McCall ("O. McCall") is a citizen and resident of Jackson County, North Carolina, currently residing at 243 Pinhook Road, Tuckasegee, North Carolina 28783. He is subject to the venue and jurisdiction of this court.

5. Defendants Joseph P. Vaughan and wife, Lori B. Vaughan ("the Vaughans") are citizens and residents of Transylvania County, North Carolina, currently residing at 1024 Rocky Mountain Road, Lake Toxaway, North Carolina 28747. They are subject to the venue and jurisdiction of this court.

EXHIBIT F

6. Defendant William W. McCall ("W. McCall") is a citizen and resident of Jackson County, North Carolina, currently residing at 68 Coachman Lane, Tuckasegee, North Carolina 28783. He is subject to the venue and jurisdiction of this court.

7. Defendant O'Neal Land Company, LLC ("O'Neal Land") a North Carolina Limited Liability Company ("LLC") is a member-managed LLC that is subject to the jurisdiction and venue of this court and can be served through its registered agent, Beth A. McTaggart at 16 Maple Street, Fletcher, NC 28732.

8. On August 7, 2009, the Kentucky Court of Appeals upheld a decision by the Laurel Circuit Court that the defendants in that case, Laura Green, William M. Burrell and O'Neal McCall were in default on a promissory note and were liable to the plaintiff Watts Realtors and Auctioneers, Inc. (Laurel Circuit Court Civil Action No. 06-CI-00494).

9. The above-referenced case was remanded to the trial court by the Kentucky Court of Appeals in order to determine the amount owed on the default of the promissory note.

10. On August 23, 2010, a non-jury trial was held in Laurel Circuit Court to determine the amount owed by the defendants Laura Green, William M. Burrell and O'Neal McCall.

11. On September 21, 2010, judgment was entered in favor of Watts Realtors and Auctioneers, Inc., against Laura Green, William M. Burrell and O'Neal McCall, jointly and severally, in the amount of $131,612.15 through August 23, 2010; and, based upon the contract interest rate of 8%, the judgment shall accrue interest in the amount of $28.49 per diem. A copy of the judgment from the Laurel Circuit Court, Commonwealth of Kentucky is attached hereto as Exhibit "A" and by this reference incorporated herein (herein referred to as "Judgment").

12. Laura Green, William M. Burrell and O'Neal McCall have refused to pay any amount of the Judgment.

13. The Judgment was made a judgment of the North Carolina courts in accordance with the Full Faith and Credit provision of the U.S. Constitution (Article IV, Section 1) and as such entered in the Superior Courts of Jackson County (Watts Realtors v. Green, et al, 13 CVS 215) and Transylvania Count (Watts Realtors v. Green, et al, 13 CVS132).

14. On September 1, 2010, exactly eight days after the above-referenced non-jury trial to determine the amount of money damages and twenty days prior to entry of the Judgment, defendants Laura R. Green, O'Neal McCall and William M. Burrell conveyed four parcels of land in Jackson County to Defendant O'Neal Land Company, LLC, by warranty deed recorded in Deed Book 1862 at Page 740, Jackson County Registry of Deeds ("Deed for Four Parcels"). A copy of the Deed for Four Parcels is attached hereto as Exhibit "B".

15. No excise tax was paid on the Deed for Four Parcels.

16. Defendant O'Neal Land Company, LLC, is a member-managed limited liability company. Upon information and belief, Defendant O'Neal McCall and Defendant William McCall are members and managers of the O'Neal Land Company, LLC.

17. On October 1, 2010, ten days after recording of the Judgment, Defendant O'Neal Land Company, LLC conveyed the Second Parcel from the Deed for Four Parcels being Lot 3A containing 1.966 acres shown on a plat recorded in Plat Cabinet 18, Slide 636, Jackson County Registry ("Lot 3-A") to Defendant Joseph P. Vaughan and Defendant Lori Burrell Vaughan. The deed for Lot 3-A was recorded on October 1, 2010, in Deed Book 1866 at Page 858, Jackson County Registry. A copy of the deed is attached as Exhibit "C".

<u>First Cause of Action</u>
Fraudulent Conveyance

18. The allegations contained in Paragraphs 1 through 17 are realleged and incorporated herein as if fully set out.

19. Defendants Laura Green, O'Neal McCall and William M. Burrell conveyed Four Parcels of real property to Defendant O'Neal Land.

20. The conveyance by these Defendants via the Deed for Four Parcels to Defendant O'Neal Land was made with intent to hinder, to delay and to defraud Plaintiff Watts Realtors, a judgment creditor.

21. Upon information and belief, Defendants Laura Green, O'Neal McCall and William M. Burrell did not receive any value for the conveyance of the Four Parcels.

22. The conveyance of the four parcels by Defendants Green, O'Neal McCall and William M. Burrell with the cooperation and informed participation of Defendant O'Neal Land and its member-manager Defendant William W. McCall was and is fraudulent in accordance with the North Carolina Uniform Fraudulent Transfer Act (*N.C.G.S.* §§39-23.1 *et seq*) ["UFTA"].

23. Upon information and belief, Defendant William McCall, as member-manager of O'Neal Land knew of and participated in the fraudulent transfer with the intent to defraud Plaintiff Watts Realtors.

24. Defendant O'Neal Land conveyed Lot 3-A to Defendants Joseph Vaughan and Lori B. Vaughan with the further intent to hinder, delay and defraud the creditor Watts Realtors.

25. Plaintiff Watts Realtors has been damaged as a result of these conveyances.

26. The Defendants' actions are the proximate cause of damages to Plaintiff in an amount in excess of $10,000.00.

<u>Second Cause of Action</u>

Unfair and Deceptive Trade Practices

27. The allegations contained in Paragraphs 1 through 26 are realleged and incorporated herein as if fully set out.

28. The actions of defendants in the fraudulent conveyances of real property described herein and multi-layered scheme to avoid financial obligations were in and affecting commerce within the meaning of *N.C.G.S. § 75-1.1.*

29. The defendants have committed unfair and deceptive trade practices by intentionally participating in acts to defraud the Plaintiff as a judgment creditor of Defendants Laura Green, O'Neal McCall and William M. Burrell.

30. The actions of the Defendants alleged herein are immoral, oppressive, unscrupulous and substantially injurious to Plaintiff and constitute aggravating circumstances.

31. The Defendants' acts of fraud are the proximate cause of damages to the Plaintiff in an amount in excess of $10,000.00.

32. Pursuant to the provisions of N.C. Gen. Stat. §§75-16 and 75-16.1, the Plaintiff is also entitled to recovery of treble damages and reasonable attorneys' fees and costs from the Defendants.

WHEREFORE, the Plaintiff respectfully prays the Court as follows:

1. That the Plaintiff have and recover damages against the Defendants as set forth N.C.G.S. 39-23.7;

2. That the Court award the Plaintiff damages in the amount greater than $10,000.00 or in amount to be determined at the trial of this matter against all Defendants for unfair and deceptive trade practices.

3. That the Plaintiff be awarded its costs, expenses and attorneys' fees of this litigation from the Defendants.

4. For such other further relief as the Court may deem just and proper.

This the 16th day of July, 2013.

DUNGAN, KILBORNE & STAHL, P.A.

Robert E. Dungan
NC Bar No. 12743
Attorney for Plaintiff
One Rankin Ave., Third Floor
Asheville, NC 28801
(828) 254-4778

TD 9-8-10

ENTERED This 21 day of Sept. 2010 Laurel Circuit/District Court By: [signature]

RECEIVED SEP 22 2010 KELLEY BROWN BREEDING

**COMMONWEALTH OF KENTUCKY**
**LAUREL CIRCUIT COURT – DIVISION II**
**CIVIL ACTION NO. 06-CI-00494**

**WATTS REALTORS AND AUCTIONEERS, INC.,** PLAINTIFF,

-VS-

**LAURA GREEN, WILLIAM M. BURRELL and O'NEAL MCCALL,** DEFENDANTS.

FILED 2010 SEP 27 PM 1:53

## JUDGMENT

A bench trial was held in this matter on August 23, 2010. All the parties were present along with their counsel.

The trial was held upon remand of the case by the Court of Appeals. In an opinion rendered on August 7, 2009, the panel upheld this Court's previous finding that Defendants were in default as to payments owed under the subject note. It also sustained the lower court's refusal to allow Defendants' counterclaim based upon an assignment purportedly given by one of Plaintiff's agents.

However, the appellate court directed that there be further proceedings to determine the exact amount owed by Defendants. It also ordered that Plaintiff be awarded its attorney fees and costs.

For its case-in-chief, Plaintiff relied upon the testimony of Kenneth Watts who is the owner of Watts Realtors and Auctioneers, Inc. Counsel also

CERTIFICATE OF RECORD
I, ROGER L. SCHOTT, CLERK OF THE LAUREL CIRCUIT DISTRICT COURT, DO CERTIFY THAT THE FOREGOING ARE TRUE AND CORRECT COPY(S) OF THE ORIGINAL DOCUMENT(S) ARE RECORDED IN MY OFFICE.
IN TESTIMONY WHEREOF WITNESS MY HAND AS CLERK AFORESAID
THE 28 DAY
Feb 2013
BY: [signature]

EXHIBIT A

certified public accountant, Debra Walker, who provided calculations showing a balance of $144,972.86 owed through June 27, 2010. Copies of the promissory note and these calculations were also tendered as exhibits. Also proffered was a copy of a statement showing that Plaintiff had incurred attorney fees in the amount of $9,907.26.

In response, Defendants relied upon the testimony of O'Neal McCall. Mr. McCall claimed that he had delivered a check to Plaintiff's agent for $10,000 to be credited against the balance owed on the note.

Upon cross-examination, Mr. McCall was not able to produce a copy of the cancelled check, nor could he name the bank upon which it was written. Also, Defendant failed to call the agent who purportedly received the check and did not include this allegation in a prior affidavit which Defendants prepared on her behalf.

Subsequent to the hearing, Plaintiff has conceded that interest on the principal should be calculated based upon the 8% contract rate. Counsel has also submitted additional calculations from Plaintiff's accountant showing a balance of $131,612.15 through August 23, 2010 at this lower rate.

## FINDINGS OF FACT

1. That the parties entered into a promissory note on or about June 28, 2000 securing a loan of $115,000.

2. That the note further provided that interest was to bear on the unpaid

balance at the rate of 8% per annum.

3. That the note further provided that failure to pay indebtedness was to constitute a default under the note and the entire balance would then be accelerated and become due and payable without further presentment.

4. That the note further provided that upon default, Defendants were to pay all costs of collection including "court costs and reasonable attorney fees of the lender".

5. As conceded in their answer, Defendants defaulted on the note by failing to pay all installments or the full amount owed on each.

6. That Defendants have failed to sustain their burden of proof as to the alleged $10,000 credit. The Court finds that there was not substantial evidence presented of any check being transferred to Plaintiff through its agent.

7. That this Court accepts the revised calculations of Plaintiff's accountant which are based upon an 8% interest rate. (See attached)

## CONCLUSIONS OF LAW

1. Pursuant to KRS § 360.040, accruing interest on a written promissory note shall bear interest in accordance with the instrument reporting such accrual.

2. Plaintiff is entitled to interest on an accelerated indebtedness which would have accrued during the time between the acceleration of the debt and entry of the judgment. Cadillac Olds, Inc. vs. Roberts, 813 S.W. 2d 287 (Ky. 1991)

In accordance with these findings of fact and conclusions of law, **IT IS HEREBY ORDERED AND ADJUDGED:**

1. That judgment be rendered in favor of Plaintiff Watts Realtors and Auctioneers, Inc. against Defendants Laura Green, William M. Burrell and O'Neal McCall, both jointly and severally, in the amount of $131,612.15 through August 23, 2010 based upon the contract interest rate of 8% and that this balance continue to accrue at that same rate in the amount of $28.49 per day thereafter.

2. That Plaintiff further be awarded its billable costs and attorney fees incurred to date as well as those which may be expended in the enforcement of this judgment.

3. That as it resolves all claims between all parties, this judgment shall be deemed **final and appealable**, there being no just cause for delay.

This the 20 day of September, 2010.

Judge John Knox Mills
Laurel Circuit Court—Division II

**DISTRIBUTION:**

John F. Kelley, Jr., Esq.
Kelley, Brown & Breeding
P. O. Drawer 490
London, Kentucky 40743-0490 (✓)

D. Bruce Orwin, Esq.
P.O. Box 716
Somerset, Kentucky 42502-0716 (✓)

MG 9-21-10
CLERK'S INITIALS DATE

JFK/dw/090710/Judgment/Watts Realtors and Auctioneers, Inc. v. Green, et al

Laura Green Vs Watts Realtors and Auctioneers, Inc.
Attachment A: Prepared by Debra Walker, CPA
Dated: August 23, 2010

| Payment Date | Check Number | Amount of Pymt | Days | Days Per Yea | Interest Rate | Interest | Principal | Note Balance |
|---|---|---|---|---|---|---|---|---|
| 6/23/2000 | Beginning Balance of Note | | | | | | | $ 115,000.00 |
| 1/31/2001 | 2320 | $ 10,000.00 | 222 | 365 | 8% | $ 5,595.62 | $ 4,404.38 | $ 110,595.62 |
| 8/6/2001 | 2604 | $ 10,000.00 | 186 | 365 | 8% | $ 4,508.67 | $ 5,491.33 | $ 105,104.28 |
| 2/6/2002 | 2876 | $ 10,000.00 | 184 | 365 | 8% | $ 4,238.73 | $ 5,761.27 | $ 99,343.01 |
| 6/27/2002 | 1100 | $ 10,000.00 | 141 | 365 | 8% | $ 3,070.11 | $ 6,929.89 | $ 92,413.11 |
| 10/21/2002 | 1300 | $ 5,000.00 | 116 | 365 | 8% | $ 2,349.57 | $ 2,650.43 | $ 89,762.68 |
| 11/29/2002 | 1523 | $ 1,925.00 | 39 | 365 | 8% | $ 767.29 | $ 1,157.71 | $ 88,604.97 |
| 12/12/2002 | 1490 | $ 425.00 | 13 | 365 | 8% | $ 252.46 | $ 172.54 | $ 88,432.44 |
| 1/24/2003 | 1588 | $ 864.55 | 43 | 365 | 8% | $ 833.45 | $ 31.10 | $ 88,401.33 |
| 2/24/2003 | 1377 | $ 1,783.45 | 31 | 365 | 8% | $ 600.64 | $ 1,182.81 | $ 87,218.53 |
| 8/13/2003 | 1900 | $ 4,800.00 | 170 | 365 | 8% | $ 3,249.79 | $ 1,550.21 | $ 85,668.31 |
| 8/23/2003 | 1914 | $ 2,110.00 | 10 | 365 | 8% | $ 187.77 | $ 1,922.23 | $ 83,746.08 |
| 9/22/2003 | 1931 | $ 4,210.00 | 30 | 365 | 8% | $ 550.66 | $ 3,659.34 | $ 80,086.74 |
| 10/16/2003 | 1986 | $ 800.00 | 24 | 365 | 8% | $ 421.28 | $ 378.72 | $ 79,708.02 |
| 12/23/2003 | 2141 | $ 2,190.00 | 68 | 365 | 8% | $ 1,187.98 | $ 1,002.02 | $ 78,705.99 |
| 6/27/2004 | | | 186 | 365 | 8% | $ 3,208.62 | | $ 81,914.61 |
| 6/27/2005 | | | 365 | 365 | 8% | $ 6,553.17 | | $ 88,467.78 |
| 6/27/2006 | | | 365 | 365 | 8% | $ 7,077.42 | | $ 95,545.20 |
| 6/27/2007 | | | 365 | 365 | 8% | $ 7,643.62 | | $ 103,188.82 |
| 6/27/2008 | | | 365 | 365 | 8% | $ 8,255.11 | | $ 111,443.92 |
| 6/27/2009 | | | 365 | 365 | 8% | $ 8,915.51 | | $ 120,359.44 |
| 6/27/2010 | | | 365 | 365 | 8% | $ 9,628.75 | | $ 129,988.19 |
| 8/23/2010 | | | 57 | 365 | 8% | $ 1,623.96 | | $ 131,612.15 |

Interest is $28.49 per day using 8% as the rate for time after 8/23/10 and before 6/28/11.

Doc ID: 004260880006 Type: CRP
Recorded: 09/01/2010 at 03:31:37 PM
Fee Amt: $34.00 Page 1 of 6
Excise Tax: $0.00
Jackson County, NC
Joe Hamilton Register of Deeds
BK 1862 PG 740-745

This instrument prepared by:
Kimberly R. Coward
Coward, Hicks & Siler, P.A.
PO Box 1918
Cashiers, NC 28717

TAX ASSESSOR'S OFFICE Received SEP - 1 2010 JACKSON COUNTY, NC

Rev. $_______________; unimproved; not primary residence
PIN: 8505-79-1133; 8505-58-9332; 8505-89-1492; whole transfer

---

STATE OF NORTH CAROLINA

COUNTY OF JACKSON WARRANTY DEED

THIS WARRANTY DEED is made this 1 day of September, 2010, by and between LAURA R. GREEN, single; O'NEAL McCALL, single, and WILLIAM M. BURRELL, married, of Post Office Box 476, Lake Toxaway, NC 28747, hereinafter referred to collectively as "Grantor," (William M. Burrell is joined by his wife, Juanelle Burrell for the limited purpose set forth herein) and O'NEAL LAND COMPANY, LLC, a North Carolina limited liability company, of 243 Pinhook Road, Tuckasegee, NC 28783, hereinafter referred to as "Grantee." The terms grantor and grantee shall be used as neuter singular designation of the parties hereto, their personal representatives, heirs, successors and assigns.

WITNESSETH:

That the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in Canada Township, Jackson County, North Carolina, and more particularly described as follows:



EXHIBIT B

FIRST PARCEL:

BEING ALL of Lot 1, Wolf Lake, containing 1.80 acres, as shown on a plat thereof recorded in Plat Cabinet 10, Slide 154, Jackson County Registry, to which reference is specifically made.

ALSO BEING all of the same property as described in that certain deed recorded in Book 1814, page 73, and a portion of Second Parcel as described in that certain deed recorded in Book 1092, Page 633, Jackson County Registry, to which reference is specifically made.

TOGETHER WITH a non-exclusive right-of-way over the existing access road, together with continuations thereof, for purposes of ingress and egress between NCSR 1759 and subject property.

TOGETHER WITH all appurtenances and SUBJECT TO all restrictions, reservations and exceptions set forth in the above-referenced deed and as shown on the above-referenced plat.

SUBJECT TO the provisions contained in that certain Amended and Restated Declaration of Restrictive Covenants for Wolf Lake Subdivision recorded in Book 1744, Page 178, Jackson County Registry, to which reference is specifically made.

In accepting this conveyance, the Grantee acknowledges that membership in Wolf Lake Property Owners Association, Inc. is an appurtenance to the property hereinabove described and hereby conveyed, that the benefits and burdens of such membership cannot be severed from the fee to which it is appurtenant, and that said benefits and burdens shall run perpetually with the land.

SECOND PARCEL:

BEING ALL of Lot 3-A, containing 1.966 acres, as shown on a plat thereof recorded in Plat Cabinet 18, Slide 636, Jackson County Registry, to which reference is specifically made.

ALSO BEING a portion of the property described in those certain deeds recorded in Book 1092, Page 633, and Book 1814, Page 633, Jackson County Registry, to which reference is specifically made.

SUBJECT TO the right-of-way of North Carolina State Road 1759 as shown on the above-referenced plat.

TOGETHER WITH all appurtenances and SUBJECT TO all restrictions, reservations and exceptions set forth in the above-referenced deeds and as shown on the above-referenced plat.

THIRD PARCEL:

BEING ALL of Lot 3-B, containing 1.964 acres, as shown on a plat thereof recorded in Plat Cabinet 18, Slide 636, Jackson County Registry, to which reference is specifically made.

ALSO BEING a portion of the property described in those certain deeds recorded in Book 1092, Page 633, and Book 1814, Page 633, Jackson County Registry, to which reference is specifically made.

SUBJECT TO the right-of-way of North Carolina State Road 1759 as shown on the above-referenced plat.

TOGETHER WITH all appurtenances and SUBJECT TO all restrictions, reservations and exceptions set forth in the above-referenced deeds and as shown on the above-referenced plat.

FOURTH PARCEL:

BEING ALL of Lot 22, containing 2.81acres as shown on a plat thereof recorded in Plat Cabinet 9, Slide 765, Jackson County Registry, to which reference is specifically made.

ALSO BEING a portion of the property described in those certain deeds recorded in Book 1076, Page 278, and Book 1814, Page 77, Jackson County Registry, to which reference is specifically made.

SUBJECT TO the rights-of-way of North Carolina State Road 1759 and North Carolina Highway 281 as shown on the above-referenced plat.

TOGETHER WITH all appurtenances and SUBJECT TO all restrictions, reservations and exceptions shown on the above-referenced plat and set forth in the above-referenced deed and the instruments referenced therein.

Juanelle Burrell hereby expressly releases and quitclaims all of her marital rights in the property herein described and hereby conveyed such rights to include the rights provided by N.C.G.S. § 50-20 and § 29-30.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple, subject to the reservations.

exceptions and limitations contained herein.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor, will warrant and defend the title against the lawful claims of all persons whomsoever except for the exceptions hereinafter stated.

Title to the property hereinabove described is conveyed subject to the following exceptions:

Exceptions and reservations contained in this deed and/or in instruments referenced herein.

Easements and rights-of-way for public and private roads and utilities, of public record.

Lien of ad valorem taxes for the current year and subsequent years, not yet due and payable.

IN WITNESS WHEREOF, the Grantor has hereunto set its hand and seal, the day and year first above-written.

Laura R. Green (SEAL) LAURA R. GREEN

O'Neal McCall (SEAL) O'NEAL McCALL

(SEAL) WILLIAM M. BURRELL

Juanelle Burrell (SEAL) JUANELLE BURRELL

STATE OF North Carolina

COUNTY OF Transylvania

I, a Notary Public of Transylvania County and the State aforesaid, certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: LAURA R. GREEN.

DATE: 9/1/10
(OFFICIAL SEAL)

MARSHA E. BRICKER NOTARY PUBLIC TRANSYLVANIA COUNTY, NC

Notary Public

Marsha E Bricker
(Printed Name of Notary)

My Commission Expires: [illegible]

STATE OF NORTH CAROLINA

COUNTY OF TRANSYLVANIA

I, a Notary Public of TRANSYLVANIA County and the State aforesaid, certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: O'NEAL McCALL.

DATE: 9/1/10

(OFFICIAL SEAL)

MARSHA E. BRICKER NOTARY PUBLIC TRANSYLVANIA COUNTY, NC

[signature]
Notary Public

MARSHA E BRICKER
(Printed Name of Notary)

My Commission Expires: May 5, 2012

STATE OF North Carolina

COUNTY OF Transylvania

I, a Notary Public of Transylvania County and the State aforesaid, certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: WILLIAM M. BURRELL.

DATE: 9/1/10

(OFFICIAL SEAL)

SANDRA G. CROWE NOTARY PUBLIC TRANSYLVANIA COUNTY, NC

Sandra G Crowe
Notary Public

Sandra G. Crowe
(Printed Name of Notary)

My Commission Expires: June 21, 2013

STATE OF North Carolina

COUNTY OF Transylvania

I, a Notary Public of Transylvania County and the State aforesaid, certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: JUANELLE BURRELL.

DATE: 9/1/10

(OFFICIAL SEAL)

Sandra G Crowe
Notary Public

Sandra G. Crowe
(Printed Name of Notary)

My Commission Expires: June 21, 2013

SANDRA G. CROWE NOTARY PUBLIC TRANSYLVANIA COUNTY, N.C.

APPROVED FOR RECORDING
JACKSON COUNTY PLANNING OFFICE
08/01/10
Signature Date

Doc ID: 004281980003 Type: CRP
Recorded: 10/01/2010 at 03:08:23 PM
Fee Amt: $76.00 Page 1 of 3
Excise Tax: $50.00
Jackson County, NC
Joe Hamilton Register of Deeds
BK 1866 PG 858-860

Received
OCT - 1 2010
BS
JACKSON COUNTY, NC

This instrument prepared by:
Kimberly R. Coward
Coward, Hicks & Siler, P.A.
PO Box 1918
Cashiers, NC 28717

Rev. $ 50.00; unimproved; not primary residence
PIN: 8505-79-1133; whole transfer

STATE OF NORTH CAROLINA

COUNTY OF JACKSON WARRANTY DEED

THIS WARRANTY DEED is made this 1st day of October, 2010, by and between O'NEAL LAND COMPANY, LLC, a North Carolina limited liability company, of 243 Pinhook Road, Tuckasegee, NC 28783, hereinafter referred to as "Grantor," and JOSEPH PAUL VAUGHAN and wife, LORI BURRELL VAUGHAN, of 1024 Rocky Mountain Road, Lake Toxaway, NC 28747, hereinafter referred to collectively as "Grantee." The terms grantor and grantee shall be used as neuter singular designation of the parties hereto, their personal representatives, heirs, successors and assigns.

WITNESSETH:

That the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in Canada Township, Jackson County, North Carolina, and more particularly described as follows:

BEING ALL of Lot 3-A, containing 1.966 acres, as shown on a plat thereof recorded in Plat Cabinet 18, Slide 636, Jackson County Registry, to which reference is specifically made.

ALSO BEING all of Second Parcel as described in that certain deed recorded in Book 1862, Page 740, Jackson County Registry, to which reference is specifically made.

EXHIBIT
C

SUBJECT TO the right-of-way of North Carolina State Road 1759 as shown on the above-referenced plat.

SUBJECT TO the restriction that no mobile homes may be placed on subject property.

TOGETHER WITH all appurtenances and SUBJECT TO all restrictions, reservations and exceptions set forth in the above-referenced deeds and as shown on the above-referenced plat.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple, subject to the reservations, exceptions and limitations contained herein.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor, will warrant and defend the title against the lawful claims of all persons whomsoever except for the exceptions hereinafter stated.

Title to the property hereinabove described is conveyed subject to the following exceptions:

Exceptions and reservations contained in this deed and/or in instruments referenced herein.

Easements and rights-of-way for public and private roads and utilities, of public record.

Lien of ad valorem taxes for the current year and subsequent years, not yet due and payable.

IN WITNESS WHEREOF, the Member/Manager of Grantor has hereunto set his hand and seal on behalf of said limited liability company, the day and year first above-written.

O'NEAL LAND COMPANY, LLC

BY: O'Neal McCall Member/Manager
O'NEAL McCALL, Member/Manager

STATE OF NC

COUNTY OF Jackson

I, a Notary Public of Jackson County and State aforesaid, do hereby certify that O'NEAL McCALL, Member/Manager of O'NEAL LAND COMPANY, LLC, a North Carolina limited liability company, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of said limited liability company.

WITNESS my hand and official stamp or seal, this the 1st day of October 2010.

(OFFICIAL SEAL)

TERESA C TRANTHAM
NOTARY PUBLIC
JACKSON COUNTY, NC
My Commission Expires 7-19-2012

[signature]
Notary Public

Terese C. Trantham
Printed Name of Notary

My Commission Expires: July 19, 2012

10-0658/nb

APPROVED FOR RECORDING
JACKSON COUNTY PLANNING OFFICE
[signature] 10/01/10
Signature Date